IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

(1) TIMOTHY HANKINS, JR.,            )
                                      )
        Plaintiff,                    )
                                      )
v.                                    )   Case No. 22-cv-00515-TCK-CDL
                                      )
                                      )   ATTORNEY LIEN CLAIMED
(1) DARIN EHRENRICH, and              )
(2) CITY OF TULSA,                    ).  JURY TRIAL DEMANDED
                                      )
                                      )
        Defendants.                   )

## COMPLAINT

COMES NOW, the Plaintiff, Timothy Hankins, Jr., and for his Complaint against Defendants, alleges and states as follows:

## INTRODUCTORY STATEMENT

1. Plaintiff Timothy Hankins, Jr. ("Plaintiff", "Mr. Hankins" or "Hankins") was born and raised in Tulsa, Oklahoma. He graduated from the University of Oklahoma in 2002.

2. Until recently, Mr. Hankins had a highly successful career in the cyber security field. He had approximately 20 years of experience in cyber security, working in Dallas, Sao Paulo, Miami and New York.

3. Through hard work and dedication, Mr. Hankins had become an expert in the cyber security business and cultivated clients and contacts across the Country.

4. As of September of 2020, Hankins had recently moved back to Tulsa and was working with a promising startup company called Armis. Mr. Hankins was serving as Vice President of Sales, managing around one-third of the revenue Armis was bringing in. Mr. Hankins

1

was working toward Armis' goal of going public with an Initial Public Offering ("IPO"). The future was bright.

5. However, it was not to be. Mr. Hankins' hard-earned career came to a screeching halt on November 23, 2020. On that day, a felony warrant was issued for Mr. Hankins' arrest. He had been charged with First Degree Rape. Mr. Hankins was, however, innocent. Indeed, there was never sufficient evidence to establish probable cause that Mr. Hankins raped anyone. Nevertheless, Defendant Lt. Ehrenrich persisted in pursuing the criminal process against Mr. Hankins all the way through trial.

6. Hankins was ultimately vindicated when a jury of his peers found him not-guilty and he was acquitted. However, the damage had already been done. Mr. Hankins' reputation was ruined. He had lost his job. He became unemployable. He was riddled with depression and anxiety. He was a broken man. Now, he is trying to pick up the pieces and retain something approaching a "normal" life.

7. Mr. Hankins has initiated this action in an effort to obtain some semblance of justice for the egregious violation of his civil rights. It is his hope that this lawsuit will expose the truth of his plight and prevent other law enforcement officers from wrongfully accusing innocent citizens of serious crimes without sufficient evidence.

## **PARTIES**

8. Plaintiff is an individual and a resident of Tulsa County, Oklahoma.

9. Defendant Darin Ehrenrich ("Lt. Ehrenrich") is a resident of the State of Oklahoma. Lt. Ehrenrich was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as police officer and supervisor employed by the City of Tulsa/Tulsa Police Department.

10. Defendant City of Tulsa ("City" or "Defendant City"), Oklahoma is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

## JURISDICTION AND VENUE

11. The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the Fourth and Fourteenth Amendments to the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

12. This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the Fourth Amendment and/or the Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

13. The acts complained of herein occurred in Tulsa County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## FACTUAL BACKGROUND

14. Paragraphs 1 to 13 are incorporated herein by reference.

15. On September 2, 2020, Mr. Hankins was first introduced to Ashley Nix ("Ms. Nix" or "Nix"). Ms. Nix was, and still is, a young Assistant District Attorney employed by the Tulsa County District Attorney's Office.

16. They had a brief meeting at the Oren restaurant and bar in Tulsa's "Brookside" area. Nix and Hankins mutually exchanged contact information with the agreement that they would meet up again for a date.

17. The next day, September 3, 2020, Mr. Hankins and Ms. Nix began a friendly conversation via text message.

**September 4, 2020**

18. Phone records show that, as of September 4, 2020, Ms. Nix was distraught over the status of a relationship with her supervisor at the District Attorney's Office, "K.E." For instance, at 2:57 a.m., Ms. Nix sent a text to Allison Nutt, a co-worker at the D.A.'s Office, asserting that K.E.'s wife had "bang[ed]" on her window at "2:30 in the morning."

19. At 3:01 a.m., around a half hour after K.E.'s wife allegedly banged on her window, Ms. Nix had a conversation, via "FaceTime", with K.E.

20. K.E.'s wife was apparently enraged over something Ms. Nix sent to K.E.'s phone.

21. Several text messages from Ms. Nix to another co-worker and friend, Heather Prater, indicate that her relationship with K.E. had reached a "breaking point."

22. On the evening of September 4, in the midst of the situation with K.E. and his wife, Ms. Nix sent a text to Mr. Hankins: "Hey, so today was an enormous shit show and I've been dealing with unrelated fallout and stuff today. What does your weekend look like?"

**September 5, 2020**

23. At 10:19 a.m., Hankins replied to Nix: "Good morning, what's your schedule today? Grab coffee or a drink this afternoon?"

24. At 6:47 p.m., Nix texted to Hankins: "[T]oday was an absolute shit day as a result of some unforeseen stuff. With that being said, I would like to grab a drink sometime. I do mean that."

25. At 7:54 p.m., Nix sent another text to Hankins: "What are you up to tonight?" Hankins replied, "What are you thinking?" Nix wrote: "Well, I can't have a late night, but I just wrapped up something, so free for a couple of hours."

4

26. They agreed to meet for drinks at Oren.

27. Prior to meeting up with Mr. Hankins, Ms. Nix continued to send texts to Heather Prater expressing her mental anguish over the end of the relationship with K.E.

28. From approximately 9:45 p.m. to 10:40 p.m., Ms. Nix and Hankins met at Oren. This was, in essence, a "first date."

29. They each had two drinks at the bar; Nix received multiple calls/texts while at Oren.

30. After two drinks and some small talk, Mr. Hankins picked up the check, believing that the night was over.

31. At 10:40 p.m., Nix and Hankins left Oren together.

32. Hankins and Nix walked outside by the bathroom entrance at Oren; she indicated that she was going somewhere else; Hankins leaned in for a hug and Nix "lunged" at him and started kissing him on the mouth.

33. Ms. Nix then insisted on going back to Mr. Hankins' house with him. They walked to his car. Ms. Nix jumped on Hankins' lap in the driver's seat and began kissing him again. Mr. Hankins had to physically move her so that he could drive.

34. At around 10:45 p.m., they arrived at Mr. Hankins' home. Ms. Nix continued to be sexually aggressive with Hankins.

35. Ms. Nix remembers being inside the house, on the kitchen counter and Hankins touching her all over her body.

36. Mr. Hankins and Ms. Nix had sexual intercourse on the kitchen counter for approximately 15 minutes. At one point, Hankins paused because he was shocked that Ms. Nix was being so sexually aggressive. Ms. Nix asked, "are you not into me?" Hankins replied, "of course I am" and gave Ms. Nix control during this first sexual encounter.

37. At around 11:00 p.m., after this first sexual encounter in the kitchen, Hankins briefly took Ms. Nix back to her car at Oren, only to discover she did not have her keys.

38. They both agreed that the keys could have fallen out in Hankins' kitchen. So, Hankins drove Nix back to his house.

39. At approximately 11:05 p.m., Hankins and Nix arrived back at his house and walked out to his patio.

40. There is limited surveillance video of Hankins and Nix on the patio.

41. The patio video shows Ms. Nix wide awake and fully conscious.

42. At one point, while Hankins is sitting in a patio chair, Ms. Nix is seen jumping onto Hankins' lap, straddling him and then placing her hands between his legs. Nix gave Hankins a "lap dance" on the patio.

43. Three to six minutes of video of Hankins and Nix in the patio chair was -- conveniently -- not recorded.

44. While still on the patio, Ms. Nix initiated and performed oral sex on Mr. Hankins for several minutes.

45. During all of her interaction with Mr. Hankins on the patio, Ms. Nix was fully conscious and initiating the physical contact.

46. At the end of the episode on patio, Ms. Nix put her arms around Hankins' neck, they stood up, and Ms. Nix threw her legs around his waist. Hankins went into the house again to get a glass of water.

47. Once in the house, Hankins attempted to locate Ms. Nix's keys, to no avail.

48. At around 11:45 p.m., Nix and Hankins left Hankins' home together. Hankins took Ms. Nix to her house to look for a spare set of keys. Hankins did not know how to get to Ms. Nix's

house. Importantly, ***Ms. Nix was lucid enough to direct Mr. Hankins to her place of residence.***

**September 6, 2020**

49. At approximately 12:00 a.m., Hankins and Nix arrived at her house to look for spare keys. There is video of Hankins and Nix at her house recorded on a "Ring" surveillance device. The Ring video shows that Hankins and Nix were clearly on friendly terms. Again, she was fully conscious.

50. After searching for keys, they both agreed that she probably left them with the valet at "DOC's", a restaurant that shares a parking lot with Oren.

51. Ms. Nix told Hankins that he was "good guy" for trying to help her.

52. At around 1:00am, Hankins dropped Ms. Nix off at DOC's to look for her car keys there.

53. Hankins waited for Ms. Nix in the parking lot for approximately 15 minutes.

54. He tried to call her, but Nix did not answer at first. Hankins then received a call from a waitress at DOC's, who initially referred to him as "Jeff". After telling the waitress that he was trying to help Nix find her keys, the waitress indicated that she would help Nix from that point. Hankins went back home.

55. Ms. Nix began asking the manager, Spencer Snow, and other employees, if they had seen her keys. The keys could not be found.

56. Ms. Snow, at Ms. Nix's request, called another man she had been dating named Jeff Dickason. Dickason came to pick Nix up at DOC's and took her home.

57. Once they arrived at her house, Ms. Nix and Dickason entered the house (possibly by breaking a window). Dickason stayed in Nix's house for 40-45 minutes. Nix asked Dickason to stay the night, but he declined and left. Ms. Nix then briefly fell sleep.

7

58. Phone records show that between 1:44 and 1:46 a.m., Ms. Nix contacted K.E. via "FaceTime". On information and belief, during the FaceTime calls, Ms. Nix attempted to convince K.E. to resume a relationship with her, but K.E. rejected her. Ms. Nix made no mention of any alleged sexual misconduct or "rape" during her FaceTime calls with K.E.

59. Phone records show that at 2:28 a.m., Ms. Nix sent a text to "Heather Prater", a friend and another Assistant District attorney, stating that K.E. "just chewed [her] out and called her crazy…." This text, once again, shows that Ms. Nix was fully awake, conscious and lucid well into the early morning hours of September 6. And though Ms. Prater is "Victim Advocate" with the District Attorney's Office, Ms. Nix failed to even imply that she had been raped or sexually assaulted.

60. At 3:00 a.m., after being "chewed out" by K.E., Ms. Nix decided to take an Uber ride to Hillcrest for a sexual assault nurse examiner, or "SANE", test. She never called 911. She did not give a handwritten statement.

61. At 3:26 a.m., Nix texted to Hankins: "Can you see if you have my keys?" Nix sent this text when she was still awaiting a SANE exam. Notably, she made no mention, or even any suggestion, of a rape allegation.

62. From around 3:30 a.m. to 5:30 a.m., the SANE nurse, Ashlea Dollins, RN, conducted her SANE examination of Ms. Nix. Ms. Nix told the SANE nurse that she could not remember what happened with Mr. Hankins. However, ***Ms. Nix never told the SANE nurse that she was unconscious or lost consciousness*** during her interactions with Mr. Hankins. Ms. Nix "den[ied] any pain or … notable injuries." In examining Ms. Nix's genitalia, the SANE nurse observed no physical injuries. Ms. Nix reported to the SANE nurse that she had "[o]ne to two drinks at the beginning of the night" and was "possibly drugged at some point." Ms. Nix admitted that she had sex with Mr. Hankins. However, Ms. Nix did not tell the SANE nurse that

8

she was "raped". Similarly, Ms. Nix did not tell the SANE nurse that any sex with Hankins was nonconsensual.

63. At approximately 5:30 a.m., the SANE nurse took blood and urine samples from Ms. Nix. Ms. Nix's neck and vaginal area are also swabbed for DNA. The samples were submitted to the Oklahoma State Bureau of Investigation ("OSBI") for analysis.

64. At 10:00 a.m., Hankins checked under the passenger's seat of his car and found Ms. Nix's keys. He drove to Nix's house and placed the keys in her mailbox.

**September 30, 2020**

65. On September 30, 2020, Tulsa police officers conducted a search of Mr. Hankins' residence in conjunction with a search warrant.

66. Det. Scott Gibson and Lt. Ehrenrich conducted the search, assisted by TPD SVU and Riverside Division Street Crimes Unit.

67. The search was being conducted on suspicion of a "drug-facilitated rape".

68. The search began at around 11:30 a.m. (after Hankins was stopped in his vehicle pulling out of his driveway)

69. Prior to being stopped on September 30, Hankins had no idea that Ms. Nix was accusing him of some sort of sexual misconduct.

70. Det. Gibson later testified that Mr. Hankins was a "cooperative … detainee…."

71. Items seized from Hankins' home include: two iPhones from Hankins' vehicle, DNA from Hankins (buccal swabs) for lab analysis, an iPad, an Apple laptop, medications, a pair of panties and two flash drives.

72. No "date rape" drug, such as "Rohypnol" or "GHB", was found at Mr. Hankins' home.

73. Importantly, the officers seized a home surveillance "DVR" system, which was located in a hallway closet. The entire DVR system was removed, seized and placed into evidence.

74. During the 3 and ½ weeks between his encounter with Ms. Nix and the search, though he had the technical expertise to do so, Hankins did not erase the video or discard any other evidence from the night of September 5. The reason for this is simple. Mr. Hankins knew he committed no crime and was later shocked to learn that he was being accused of a crime.

**October 15, 2020**

75. On October 15, 2020, the DVR was "examined" by Sgt. Eric Leverington of the Cyber Crimes Unit.

76. The DVR was still sealed when brought to Sgt. Leverington on October 15.

77. The DVR device is known as an "HKS 7200 DVR". It is a motion activated video surveillance system.

78. Sgt. Leverington "logged into" the DVR and "extracted" the video data.

79. The video shows part of Mr. Hankins and Ms. Nix's interactions on the patio, as referenced above.

80. After extraction, the DVR video was provided to Lt. Ehrenrich in furtherance of his investigation.

**November 4, 2020**

81. On November 4, 2020, OSBI released its "Criminalistics Examination Report" with respect to the blood and urine samples obtained from Ms. Nix. As reported by OSBI, there were no drugs in Ms. Nix's system on the morning of September 6, other than amphetamine, for which she had a prescription. In other words, OSBI lab analysis proves that Mr. Hankins did not "drug" Ms. Nix.

82. Thus, by November 4, 2020, at the latest, TPD investigators, including Lt. Ehrenrich, knew there was **no evidence** of a "drug-facilitated rape" as initially suspected.

**November 16, 2020**

83. On November 16, 2020, OSBI released a second "Criminalistics Examination Report" concerning DNA analysis. Importantly, the November 16 Report indicates that a ***"Sperm Fraction" sample*** taken from Ms. Nixon's body on the morning of November 6, was a "partial mixture of at least two individuals", but did ***not match Mr. Hankins*** ' DNA profile.

**November 23, 2020**

84. On November 23, 2020., Lt. Ehrenrich signed a sworn Probable Cause Affidavit.

85. The Probable Cause Affidavit was executed for the purposes of charging Mr. Hankins with -- and arresting him for -- the felony of First-Degree Rape under 21 Okla. Stat. §§ 1111 (A)(4) and (5), and in the alternative, the felony of Sexual Battery under 21 Okla. Stat. § 1123(B)(1).

86. 21 Okla. Stat. §§ 1111 (A)(4) and (5) provide as follows:

> A. Rape is an act of sexual intercourse involving vaginal or anal penetration accomplished with a male or female who is not the spouse of the perpetrator and who may be of the same or the opposite sex as the perpetrator under any of the following circumstances:
> \*\*\*
> 4. Where the victim is intoxicated by a ***narcotic or anesthetic agent, administered by or with the privity of the accused*** as a means of forcing the victim to submit;
>
> 5. Where the victim is at the time ***<u>unconscious</u> of the nature of the act <u>and</u> this fact is known to the accused…***

(emphasis added).

87. 21 Okla. Stat. §§ 1123(B)(1) defines "sexual battery" as "the intentional touching, mauling or feeling of the body or private parts of any person sixteen (16) years of age or older, in a lewd and lascivious manner…[w]ithout the consent of that person…"

88. Lt. Ehrenreich knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence of any nonconsensual sexual contact between Ms. Nix and Mr. Hankins.

89. Lt. Ehrenreich knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence that Ms. Nix was "intoxicated by a narcotic or anesthetic agent, administered by or with the privity of the accused as a means of forcing [Ms. Nix] to submit" to Mr. Hankins.

90. Lt. Ehrenreich knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence Ms. Nix was, at any time she had sexual contact with Mr. Hankins, "unconscious of the nature of the act…"

91. Lt. Ehrenreich knew, when he executed the sworn Probable Cause Affidavit, that there was no evidence it was "known" to Mr. Hankins that Ms. Nix "unconscious of the nature of the act…" Indeed, all the evidence is to the contrary.

92. On balance, the Probable Cause Affidavit states that Ms. Nix was intoxicated during her contact with Mr. Hankins on the night September 5, 2020. Even assuming this is true, it is not a crime to have sexual contact with an intoxicated individual.

93. In any event, the Probable Cause Affidavit is far more notable for what Lt. Ehrenreich left out. To wit, Lt. Ehrenreich **omitted** the following exculpatory facts from the Probable Cause Affidavit: **(1)** Lt. Ehrenrich had a pre-existing professional relationship with Ms. Nix; **(2)** Ms. Nix stated that she only had "one or two" drinks on September 5 despite ample evidence that this was a lie; **(3)** it was not unusual for Ms. Nix to experience memory loss when drinking alcohol; **(4)** Nix recalls willingly going to Mr. Hankins' house with him and having

physical contact with him in the kitchen; **(5)** the lab test results showed there were ***no drugs***, aside from a prescription amphetamine, in Ms. Nix's system; **(6)** lab analysis showed that Ms. Nix had DNA from at least two other males on her body; **(7)** the surveillance video from Mr. Hankins' patio shows Ms. Nix wide awake and initiating physical contact with Mr. Hankins; **(8)** the surveillance video from Mr. Hankins' patio shows Ms. Nix jumping into Mr. Hankins' lap, straddling him and placing her hands between his legs; **(9)** the surveillance video from Mr. Hankins' patio shows Ms. Nix positioning her arms around Hankins' neck and throwing her legs around his waist; **(10)** three to six minutes of the contact between Hankins and Nix -- on the patio -- was not recorded; **(11)** after their contact at Mr. Hankins' house, Mr. Hankins took Ms. Nix to her house to help her look for her keys; **(12)** "Ring" video from Nix's home, after the alleged "rape", shows Hankins and Nix communicating on friendly terms; **(13)** "Ring" video from Nix's home, after the alleged "rape", shows Nix is fully conscious; **(14)** Ms. Nix never told the SANE nurse, nor any investigator, that she was unconscious during her contact with Mr. Hankins; **(15)** Ms. Nix "den[ied] any pain or … notable injuries" after her contact with Hankins; **(16)** Ms. Nix admitted that she had sex with Mr. Hankins, but never stated that any sex with Mr. Hankins was forced or nonconsensual; **(17)** Ms. Nix did not tell the SANE nurse, nor any investigator, that she was "raped"; **(18)** no "date rape" drug, such as "Rohypnol" or "GHB", was found at Mr. Hankins' home, nor in Ms. Nix's blood or urine; and **(19)** even after submitting to a SANE examination, Ms. Nix sent a text to Hankins, not to accuse him of raping her, but to ask whether he had found her keys.

94. Despite the utter lack of evidence supporting a rape or sexual battery charge, Lt. Ehrenreich proceeded to sign the sworn Probable Cause Affidavit omitting the overwhelming exculpatory evidence summarized above.

95. On the basis of this materially incomplete Probable Cause Affidavit, a warrant was issued for Mr. Hankins' arrest.

96. Felony First Degree Rape and alternative Sexual Battery charges were filed against Mr. Hankins.

**December 1, 2020**

97. After learning that he had been charged and a warrant was issued for his arrest, Mr. Hankins voluntarily turned himself in for booking at the Tulsa County Jail. He then posted bond and was released.

**April 27, 2021**

98. On April 27, 2021, the State filed an Amended Information against Mr. Hankins, maintaining the charge of felony First Degree Rape under 21 Okla. Stat. §§ 1111 (A)(4) and (5), but amending the "alternative" charge to felony Rape by Instrumentation under 21 Okla. Stat. § 1111.1.

99. Rape by Instrumentation is defined as "an act …. in which any inanimate object or any part of the human body, not amounting to sexual intercourse is used in the carnal knowledge of another person without his or her consent and penetration of the anus or vagina occurs to that person…." 21 Okla. Stat. § 1111.1.

100. This amended alternative charge suffers from the same fatal defect as the other charges brought against Mr. Hankins. That is, there is no evidence that any sexual contact between Hankins and Nix was nonconsensual.

**April 25-29, 2022**

101. From April 25 to April 29, 2022, Mr. Hankins was subjected to a felony jury trial.

102. Lt. Ehrenreich testified against Mr. Hankins.

103. On April 29, 2022, after hearing the evidence, the jury found Mr. Hankins not guilty on all charges and he was acquitted.

104. Prior to deliberations, the jury was instructed on the law. Importantly, the jury was instructed that "unconscious to the nature of the act", as used in 21 Okla. Stat. §§ 1111(5), means "incapable of resisting because the victim meets any one of the following conditions:

> (A) Was unconscious or asleep;
> (B) Was not aware, knowing, perceiving, or cognizant that the act occurred.
>
> A victim's lack of memory may be considered by you with all the other evidence, however, a victim's lack of memory, standing alone is insufficient to establish unconsciousness of the nature of the act."

105. Applying this standard, there was plainly ***never any evidence*** that Ms. Nix was "unconscious to the nature of the act".

106. Mr. Hankins was wrongfully arrested and maliciously prosecuted in violation of his Fourth and/or Fourteenth Amendment rights.

107. As a direct and proximate result, Plaintiff suffered economic and personal losses (including lost wages, loss of employment, lost business opportunities and attorney fees), irreparable damage to his reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

### Wrongful/Unreasonable Arrest/Seizure in Violation of the Fourth Amendment to the United States Constitution (Pursuant to 42 U.S.C. § 1983)

108. Plaintiff re-alleges and incorporates by reference paragraphs 1 through 107, as though fully set forth herein.

109. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons … against unreasonable … seizures, shall not be violated, and no warrants shall issue, but upon probable cause…."

110. It is well-established that a person's surrender to the State's show of authority by reporting to police after learning of an outstanding warrant constitutes a seizure for purposes of the Fourth Amendment. Thus, Mr. Hankins' person was "seized" for the purposes of the Fourth Amendment.

111. In addition, the seizure of Mr. Hankins' person was unreasonable in violation of his Fourth Amendment rights.

112. The seizure of Mr. Hankins was unreasonable as it lacked probable cause.

113. Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

114. Here, there was no evidence of any nonconsensual sexual contact between Ms. Nix and Mr. Hankins.

115. Furthermore, there was no evidence that Ms. Nix was intoxicated by a narcotic or anesthetic agent, administered by or with the privity of the accused as a means of forcing Ms. Nix to submit to Mr. Hankins.

116. Moreover, there was no evidence that Ms. Nix was, at any time she had sexual contact with Mr. Hankins, unconscious of the nature of the act.

117. Additionally, there was no evidence that it was "known" to Mr. Hankins that Ms. Nix unconscious of the nature of the act.

118. Thus, there were no, or wholly insufficient, facts and circumstances within Lt. Ehrenrich's knowledge, and of which he had reasonably trustworthy information, sufficient to warrant a man of reasonable caution in the belief that any of crimes Mr. Hankins was charged had been committed.

119. Lt. Ehrenrich effectuated the seizure of Mr. Hankins' person without probable cause.

120. This unreasonable seizure violated Plaintiff's Fourth Amendment rights.

121. As a direct and proximate result of this unreasonable seizure, Plaintiff suffered damages, including, but not limited to, economic and personal losses (including lost wages, loss of employment, lost business opportunities and attorney fees), irreparable damage to his reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

**Malicious Prosecution in Violation of the Fourth and/or**
**Fourteenth Amendment to the United States Constitution**
**(Pursuant to 42 U.S.C. § 1983)**

122. Paragraphs 1-121 are incorporated herein by reference.

123. By executing -- and swearing to -- the Probable Cause Affidavit, Lt. Ehrenrich initiated "legal process", or "brought about" the criminal action, against Plaintiff.

124. By executing -- and swearing to -- the Probable Cause Affidavit, and later testifying against Plaintiff, Lt. Ehrenrich facilitated Plaintiff's continued prosecution.

125. The criminal proceeding against Plaintiff was terminated in Plaintiff's favor, in the form of a full acquittal after a trial on the merits.

126. There was no probable cause to support the seizure of Plaintiff or his continuing prosecution.

127. In a case such as this, involving information omitted from an affidavit, the existence of probable cause is determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

128. As discussed *supra*, Lt. Ehrenrich omitted numerous exculpatory facts from the Probable Cause Affidavit. And, if those omitted facts had been included in the Affidavit, there would plainly be no probable cause for the warrant.

129. Additionally, Lt. Ehrenrich knowingly or recklessly omitted information from the Affidavit which, if included, would have vitiated probable cause.

130. As a direct and proximate result of this malicious prosecution, Plaintiff suffered damages, including, but not limited to, economic and personal losses (including lost wages, loss of employment, lost business opportunities and attorney fees), irreparable damage to his reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

**Municipal Liability**

131. Paragraphs 1-130 are incorporated herein by reference.

132. There is an affirmative causal nexus between the violation of Plaintiff's Fourth Amendment rights and established policies or customs that were maintained by the City of Tulsa/TPD.

133. The policies or customs include:

    A. A failure to adequately train and/or supervise TPD officers, including Lt. Ehrenrich, with respect to the Fourth Amendment rights of citizens;

    B. A failure to adequately train and/or supervise TPD officers, including Lt. Ehrenrich, with respect to probable cause to arrest as mandated by the Fourth Amendment;

C. A failure to adequately train and/or supervise TPD officers, including Lt. Ehrenrich, with respect to proper documentation of probable cause through probable cause affidavits utilized to initiate criminal proceedings against citizens;

D. A specific failure to adequately train and/or supervise TPD officers, including Lt. Ehrenrich, to not omit exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

E. An established pattern, practice and custom of TPD officers seizing persons without probable cause;

F. An established pattern, practice and custom of TPD officers omitting exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

G. A failure to reprimand or discipline -- and/or ratifying the conduct of -- officers who violate the Fourth Amendment rights of citizens.

134. These policies and customs were closely related to the violation of Plaintiff's constitutional rights.

135. The City's officials acted with "deliberate indifference".

136. "Deliberate Indifference," on the governmental level may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm. Deliberate indifference is defined differently for Eighth Amendment and municipal liability purposes. In the prison conditions context, deliberate indifference is a subjective standard requiring actual knowledge of a risk by the official. In the municipal liability context, deliberate indifference is an objective standard which is satisfied if the risk is so obvious that the official should have known of it.

137. Here, the risk in maintaining the above-described policies and customs was so obvious that it amounted to deliberate indifference to the rights of persons with whom TPD come into contact. Put another way, the risk accompanied by maintaining the above-described policies and customs was so obvious that the City should have known of it.

138. As a direct and proximate result of the above-described policies and customs, Plaintiff suffered damages, including, but not limited to, economic and personal losses (including lost wages, loss of employment, lost business opportunities and attorney fees), irreparable damage to his reputation, humiliation, emotional distress, pain and suffering, and the damages alleged herein.

## **PRAYER FOR RELIEF**

WHEREFORE, based on the foregoing, Plaintiff prays this Court grant him the relief sought, including but not limited to actual, compensatory and punitive damages in excess of Seventy-Five Thousand Dollars ($75,000.00), with interest accruing from the date of filing suit, the costs of bringing this action, a reasonable attorneys' fee, along with such other relief as is deemed just and equitable.

Respectfully submitted,

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
Robert M. Blakemore, OBA #18656
Smolen & Roytman
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669

*Attorneys for Plaintiff*