# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **(1)** | **TIMOTHY HANKINS, JR.,** | ) |
| | | ) |
| | **Plaintiff,** | ) |
| | | ) |
| **v.** | | )     **Case No. 22-CV-515-SEH-CDL** |
| | | ) |
| **(1)** | **DARIN EHRENRICH and,** | ) |
| **(2)** | **CITY OF TULSA,** | ) |
| | | ) |
| | **Defendants.** | ) |

## MOTION FOR SUMMARY JUDGMENT
## AND BRIEF IN SUPPORT OF DEFENDANT DARIN EHRENRICH

COMES NOW Defendant Darin Ehrenrich and, pursuant to Fed. R. Civ. Proc. 56, hereby files this Motion for Summary Judgment and Brief in Support. For the reasons discussed herein, Defendant Ehrenrich is entitled to qualified immunity and therefore requests the Court enter judgment in his favor, and against Plaintiff, as a matter of law.

Respectfully submitted,

Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Matthew A. Dunn, OBA #33500
mdunn@bestsharp.com
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorney for Defendant*
*Darin Ehrenrich*

November 20, 2024

## TABLE OF CONTENTS

                                                                              **PAGE**

I.    INTRODUCTION...................................................................................................1

II.   STATEMENT OF UNCONTROVERTED FACTS.................................................3

III.  ARGUMENTS AND AUTHORITIES....................................................................9

      A.    LEGAL STANDARDS ................................................................................9

      B.    DEFENDANT EHRENRICH IS ENTITLED TO QUALIFIED
            IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT "FALSE
            ARREST" CLAIM......................................................................................11

            1.    Defendant Ehrenrich Did Not Violate Plaintiff's Fourth Amendment
                  Constitutional Rights ......................................................................11

                  a.    Plaintiff is Estopped from Re-Litigating the Issue of
                        Probable Cause.......................................................................13

                  b.    Probable Cause Existed for Plaintiff's Arrest................................16

                  c.    Ehrenrich Did Not Act With Reckless Disregard for
                        the Truth of the Allegations ..............................................22

            2.    The Law Was Not Clearly Established; *Arguable* Probable Cause
                  Existed for Plaintiff's Arrest.........................................................22

      C.    DEFENDANT EHRENRICH IS ENTITELD TO QUALIFIED
            IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT
            "MALICIOUS PROSECUTION" CLAIM.......................................................23

            1.    Defendant Ehrenrich Did Not Violate Plaintiff's Fourth Amendment
                  Constitutional Rights .....................................................................23

                  a.    Plaintiff Cannot Show that Probable Cause Was Lacking.............24

                  b.    The Findings of the State Criminal Court Broke the Chain of
                        Causation with Respect to Ehrenrich.............................24

                  c.    Ehrenrich Did Not Act With Malice..........................................24

            2.    The Law Was Not Clearly Established......................................................25

IV.   CONCLUSION ......................................................................................................25

i

## <u>TABLE OF AUTHORITIES</u>

<u>CASE LAW</u>

*Adamson v. Dayton Hudson*,
    774 P.2d 478 (Okla. App. 1989) ....................................................................14

*Allen v. McCurry*,
    449 U.S. 90 (1980) .......................................................................................13

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ....................................................................................10

*Bailey v. Twomey*,
    791 Fed. Appx. 724 (10th Cir. 2019) ...........................................................25

*Beard v. City of Northglenn*,
    24 F.3d 110 (10th Cir. 1994) ...........................................................12, 13, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ....................................................................................10

*Christopher v. Circle K Conv. Stores, Inc.*,
    937 P.2d 77 (Okla. 1997) .............................................................................14

*Cook v. Aagard*,
    547 Fed. Appx. 857 (10th Cir. 2024) ...........................................................14

*Cortez v. McCauley*,
    478 F.3d 1108 (10th Cir. 2007) ...................................................................12

*Cox v. Glanz*,
    800 F.3d 1231 (10th Cir. 2015) ...................................................................11

*Craig v. City of Hobart*,
    2010 WL 680857 (W.D. Okla. 2010) ..........................................................14

*Crudup v. Schulte*,
    12 Fed. Appx. 682 (10th Cir. 2001) ............................................................24

*Gamel-Medler v. Pauls*,
    2019 WL 11278465 (W.D. Okla. 2019) ......................................................14

*Harlow v. Fitzgerald*,
    457 U.S. 800 (1982) ....................................................................................10

*Haring v. Prosise,*
     462 U.S. 306 (1983)   ...........................................................................................13

*Herrera v. City of Albuquerque,*
     589 F.3d 1064 (10th Cir. 2009) ..........................................................................12

*Hubbert v. City of Moore,*
     923 F.2d 769 (10th Cir. 1991) .....................................................13, 14, 15, 16

*Kapinski v. City of Alburquerque,*
     964 F.3d 900 (10th Cir. 2000) .............................................................13, 20, 22

*Kaufman v. Higgs,*
     697 F.3d 1297 (10th Cir. 2012) ..........................................................................12

*Kerns v. Bader,*
     663 F.3d 1173 (10th Cir. 2011) ..........................................................................11

*Malley v. Briggs,*
     475 U.S. 335 (1986)   ...........................................................................................12

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
     475 U.S. 574 (1986)   ...........................................................................................10

*Medina v. Cram,*
     252 F.3d 1124 (10th Cir. 2001) ..........................................................................11

*Messerschmidt v. Millender,*
     132 S. Ct. 1235 (2012)...................................................................................12, 23

*Mglej v. Gardner,*
     974 F.3d 1151 (10th Cir. 2020) ..........................................................................24

*Moon v. City of Shawnee,*
     2008 WL 2570949 (W.D. Okla. 2008) ...............................................................24

*Mullenix v. Luna,*
     136 S. Ct. 305 (2015)   .........................................................................................22

*Reeves v. Chafin,*
     547 F. Supp.3d 1056 (D.N.M. 2021) ...............................................................25

*Robinson v. Goodner's Wholesale,*
     50 P.3d 1149 (Okla. Civ. App. 2002) ...............................................................14

*Serna v. Colorado Dept. of Corrections,*
     455 F.3d 1146 (10th Cir. 2006) ..........................................................................10

*Snell v. Tunnell*,
    920 F.2d 673 (10th Cir. 1990) ........................................................................12

*Stonecipher v. Valles*,
    759 F.3d 1134 (10th Cir. 2014) ...............................................11, 13, 19, 23, 24

*Taylor v. Meacham*,
    82 F.3d 1556 (10th Cir. 1996) ...............................................................23, 24

*Toevs. v. Reid*,
    685 F.3d 903 (10th Cir. 2012) .........................................................................11

*Townes v. City of Tulsa, Oklahoma*,
    96 Fed. Appx. 656 (10th Cir. 2004)..................................................................22

*U.S. v. Leon*,
    468 U.S. 897 (1984) ........................................................................................12

*United States v. Martin*,
    613 F.3d 1295 (10th Cir. 2010) .......................................................................11

*Wilkins v. DeReyes*,
    528 F.3d 790 (10th Cir. 2008) ...................................................................23, 24


## STATUTES

28 U.S.C. § 1738          .........................................................................................13

42 U.S.C. §1983          ..........................................................10, 13, 14, 23

21 O.S. §1111(A)(5)      .......................................................................2, 16

21 O.S. §1111.1           ........................................................................ 17

21 O.S. §1114(4)          .......................................................................2, 16

21 O.S. §1123(B)(1)      .......................................................................3, 17


## OTHER

Fed. R. Civ. P. 56        .........................................................................................10

**<u>INDEX OF EXHIBITS</u>**

Exhibit 1:      Sexual Assault Nurse Examination (COT Disc Resp 00007-15)

Exhibit 2:      TRACIS Original Incident Report (COT Disc Resp 00001-16)

Exhibit 3:      TPD Supplemental Offense Report (COT Disc Resp 00018-43)

Exhibit 4:      Forensic Laboratory Reports (COT Disc Resp 00044-67)

Exhibit 5:      OSBI Forensic Lab DNA Report (COT Disc Resp 000196-198)

Exhibit 6:      Affidavit for Search Warrant (COT Disc Resp 00068-70)

Exhibit 7:      Search Warrant and Items Seized (COT Disc Resp 00071, 72, 74-77, 1126)

Exhibit 8:      Probable Cause Affidavit (COT Disc Resp 000191-192)

Exhibit 9:      Transcript of Preliminary Hearing, Case No. CF-2020-5224 (dated 4/28/21 and 5/19/21) (COT Disc Resp 00204-397)

Exhibit 10:     Transcript of Jury Trial, Case No. CJ-2020-5224 (dated 4/26/22- 4/29/22) (COT Disc Resp 000398-956)

Exhibit 11:     Deposition Excerpts of Timothy Hankins

Exhibit 12:     Deposition Excerpts of Darin Ehrenrich

Exhibit 13:     Declaration of Darin Ehrenrich

Exhibit 14      Declaration of Debra Vincent

Exhibit 15:     Deposition Excerpts of T.K. Talley

Exhibit 16:     Surveillance Video from Hankins' Residence (COT Disc Resp 00099)

Exhibit 17:     Surveillance Video from Nix Residence (COT Disc Resp 00098)

Exhibit 18:     Surveillance Video from Oren's Restaurant (COT Disc Resp 00097)

Exhibit 19:     Judgment Roll, Case No. CJ-2020-5224 (incl. docket sheet) (certified)

**MOTION FOR SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF DEFENDANT DARIN EHRENRICH**

COMES NOW Defendant Darin Ehrenrich and, pursuant to Fed. R. Civ. Proc. 56, hereby files this Motion for Summary Judgment and Brief in Support.

## I.    INTRODUCTION

On September 6, 2020, at around 3:00 in the morning, Ashley Nix presented to Hillcrest Medical Center to have an examination performed by a sexual assault nurse examiner (SANE) and to report a sexual assault. According to her documentation, Ms. Nix stated that she had been out the night before with a guy named "Tim," who she had recently met. She reported multiple blank spaces in her memory of the night. She stated that she had been drinking at the beginning of the night, but was concerned that she had possibly been drugged at some point during the night. She had blanks in her memory, followed by vague recollection of a sexual encounter, followed by more large blank spaces in her memory, with her ultimately ending up at a restaurant, crying, looking for her keys and finding her underwear in her purse.

The SANE nurse documented that Nix was tearful and slightly groggy at the time of the exam, again with notable memory loss regarding several hours of the night. There were no visible injuries noted but some blood noted on the internal vaginal exam. The SANE nurse obtained blood and urine samples from Nix, because she had expressed concern about possibly being drugged at some point during the night. Swabs were also obtained for DNA testing from Nix.

The Tulsa Police Department (TPD) was contacted, and TPD dispatched Officer T.K. Talley to Hillcrest. Talley spoke with Nix, who wanted to report a sexual assault. She told Talley about the blanks in her memory, finding her panties in her purse and believing she had been drugged and victimized. Talley completed a TPD Incident Report, which started the investigation.

Defendant Darin Ehrenrich is and was a lieutenant supervising TPD's Special Victims' Unit (SVU), which includes detectives assigned to investigate sex crimes. After returning home

1

from Hillcrest Medical Center on September 6, Ms. Nix contacted Detective Ehrenrich. Ms. Nix was an Assistant District Attorney working in the Tulsa County District Attorney's Office with the SVU prosecuting sex crimes. Because of her position in the DA's office working closely with detectives in the SVU unit of TPD, she contacted Ehrenrich to inform him of the situation.

Ehrenrich conducted the investigation the same as he would any other.[1] He, of course, reviewed the initial report taken by Talley and reviewed the documentation of the SANE exam. He interviewed Nix. He interviewed people with whom Nix had interacted in the hours before and after the incident. Ehrenrich obtained a search warrant for Hankins' residence where, among other things, he gathered surveillance video showing Hankins and Nix interacting outside the residence. He obtained a buccal swab from Hankins for DNA purposes. Ehrenrich asked to interview Hankins, but Hankins refused. During the investigation, Ehrenrich also obtained downloads of Nix's cell phone and obtained surveillance video from Nix's residence.

The DNA results of Ms. Nix's external genitalia swabs and the internal vaginal swabs indicated "Timothy Hankins cannot be excluded as a potential contributor" of DNA found on Nix. The lab analysis of Ms. Nix's blood sample obtained during the SANE exam revealed the blood alcohol level of .18, some three (3) hours after her encounter with Hankins.

Ehrenrich submitted his entire investigation – all of the documents, all of the video, all of the lab analysis, all of the phone records, everything – to the Payne County District Attorney's Office.[2] In addition to providing them with his investigative materials, he also discussed the case with them at length, providing additional information as requested. After receiving the investigation file and evidence, the Payne County DA's Office made the independent decision to file charges against Hankins for rape in the first degree (21 O.S. §1111(A)(5) and §1114(4)) or in

---

[1] Ehrenrich's Report summarizing his investigation is attached as Exhibit 3.

[2] Because Nix worked for the Tulsa County DA's Office, that office recused itself. The Oklahoma Attorney General's Office referred the case to the Payne County DA's Office. Payne County Assistant DA Debra Vincent was the primary prosecutor on the case, assisted by ADA Erica Garuccio. (Ex. 14).

the alternative sexual battery (21 O.S. §1123(B)(1)).  The DA's Office asked Ehrenrich to draft a probable cause affidavit, which he did.  He provided that affidavit to the prosecutors.  The D.A.'s Office submitted the probable cause affidavit to Judge David Guten who found there **was probable cause** and issued an arrest warrant for Hankins.

That same day, the Payne County DA's Office filed criminal charges against Hankins. (Case No. CF-2020-5224, Tulsa County).  In the criminal case, Hankins was represented by well-known and experienced defense attorney Allen Smallwood.  Prior to trial, the District Court (Judge Tanya Wilson presiding) conducted an extensive, two-day preliminary hearing, wherein Hankins was allowed to present evidence, interrogate and cross-examine witnesses (including Nix and Ehrenrich), and make legal arguments.  At the conclusion of the hearing, Judge Wilson found that **sufficient evidence existed to bind Hankins over for trial**.  The trial judge later overruled a related "Motion to Quash Evidence Adduced at Preliminary Hearing" filed by Hankins.  At the subsequent jury trial, following lengthy deliberations, the jury acquitted Hankins.

Hankins has now sued Ehrenrich alleging Fourth Amendment violations premised on an (1) "unlawful arrest" and (ii) malicious prosecution.  (Doc. 2).  However, to clarify, Plaintiff makes no allegation that the probable cause affidavit written by Ehrenrich and submitted by the DA's Office to Judge Guten contained any false statements.  Rather, Plaintiff's claims are premised on nineteen alleged "exculpatory facts" which Plaintiff asserts were improperly omitted by Ehrenrich. (Doc. 2, ¶93; Ex. 11 at 176-177).  As stated below, Ehrenrich is entitled to qualified immunity.

## II.    STATEMENT OF UNCONTROVERTED FACTS

1.    On or about September 2, 2020, Ashley Nix and Timothy Hankins were introduced to each other by mutual acquaintance at Oren's Restaurant.  (Doc. 2, ¶15-17; Ex. 9, Tr. Prel. Hg. [Ashley Nix] at p. 48; Ex. 3 at 000018; Ex. 10 at 364-365).

2.      On the evening of September 5, 2020, Nix and Hankins arranged to meet again at Oren's for drinks, and they were together at the bar having drinks for approximately one hour and left the bar together.  (Doc. 2, ¶26, ¶ 28; Ex. 9 at 49-51; Ex. 3 at 000018).

3.      Surveillance video from Hankins' residence, (Ex. 16), shows the following:

    a.      They arrive in Hankins' vehicle at his residence at 10:55:32 p.m. and walk toward the residence.[3]  At approximately 11:14 p.m. Hankins and Nix return to his vehicle and leave his residence briefly, returning to his residence at 11:22:55 p.m.

    b.      A patio camera at Hankins' residence shows Nix and Hankins on the patio from 11:21:40 p.m. until 11:36:20 p.m., at which time Hankins carries Nix into the residence.

    c.      At 12:01:04 a.m., Hankins and Nix exit the residence, and at 12:04:20 a.m. depart the residence in Hankins' vehicle.  (Ex. 16).

4.      A RING surveillance video at Nix's residence, (Ex. 17), shows that, shortly after midnight, Hankins and Nix approach her front door and appear to be looking for her keys in her purse, and apparently unable to find the keys immediately leave without entering the residence.

5.      Hankins then drove Nix to Doc's Restaurant, which is adjacent to and shares a parking lot with Oren's, apparently in hope that Nix's keys were with the parking valet.  Nix entered the restaurant alone.  Hankins left.  The staff inside Doc's helped Nix secure alternative transportation home, since she was unable to drive herself home.  (Doc 2, ¶52-56; Ex. 9, Tr. Prel. Hg. [Nix] at 60-61; Ex. 9, Tr. Prel. Hg. [Spencer Snow] at 122-127).

6.      Jeff Dickason, an acquaintance of Nix whose number was in her recent contacts in her phone, was called by Doc's employee Spencer Snow and, when informed of the situation, went to Doc's, picked up Nix and brought her to her home.  He helped her get into her house through a window, and he left her residence shortly thereafter.  (Ex. 9, Tr. Prel. Hg. [Spencer Snow] at 127; Ex. 9, Tr. Prel. Hg. [Nix] at 61-62).

---

[3] Video times are based on timestamp on the video itself, which was later determined to be approximately 11 minutes ahead of actual time.

7.     At approximately 3:00 a.m. on September 6, 2020, Nix went to Hillcrest Medical Center in order to have a sexual assault exam performed, and to report the assault. (Ex. 9, Tr. Prel. Hg. [Nix] at 65). That examination was performed by a sexual assault nurse examiner (SANE), Ashlea Dollins, R.N. (Ex. 1, SANE Exam). According to Dollins:

- Nix appeared pretty tearful and a little bit groggy at the time of the exam;
- Nix identified the location of the assault as a kitchen in a foreign house completely dark inside;
- Nix identified the assailant as male, white, named Tim;
- Nix reported multiple blank spaces in her memory of the night;
- Nix indicated consuming alcohol at the beginning of the night and possibly being drugged at some point;
- Nix reported a memory of a sexual encounter among blank spaces in her memory;
- Nix reported losing her keys, but finding her underwear in her purse;
- She reported being at Doc's, but had no idea how she got there or where Tim went;
- Nix reported huge pieces of the night missing, several hours' worth. (Ex. 1; Ex. 9 at 151-174).

8.     The Tulsa Police Department (TPD) was contacted regarding the SANE exam, and Officer T.K. Talley was dispatched to Hillcrest Medical Center. (Ex. 2, TRACIS Original Incident Report; Ex. 9, Tr. Prel. Hg. [Talley] at 132; 139-140). Talley spoke with the SANE nurse and Ms. Nix. (Ex. 2). According to Talley, Ms. Nix reported:

- That after drinking not even half of her drink with Hankins, she began to black out and did not remember even finishing her one and only drink;
- Nix stated that she blacked out from that point on for the next several hours remembering small pieces in time;
- She recalled being in an empty house with no furniture and no lights;
- Nix recalled sitting on what felt like a kitchen counter with Hankins standing in front of her trying to grope and kiss her;
- Nix reported she felt as if she was asleep then, and woke up to Hankins inside of her, then blacked out again;
- Ashley reported a memory of walking on Brookside, looking for her keys, finding her underwear in her purse and stumbling into Doc's restaurant where an employee helped her secure a ride home;
- Nix reported remembering bits and pieces that she had blacked out numerous times from the only one drink that she had, and that she found her underwear in her purse, but no keys, at which time Nix realized she may have been drugged and victimized;
- Officer Talley documented that Nix did not remember much when he initially spoke to her before the SANE exam, and most of the bits and pieces she recalled she related to him after the exam.

(Ex. 15, Talley Deposition at 103-108; Ex. 2, TRACIS Report; Ex. 9 at 131-141).

9. Ashley Nix is, and at the time was, an Assistant District Attorney with the Tulsa County District Attorney's Office.  At the time of the incident, she was one of the prosecutors assigned to the team of prosecutors, referred to as the special victims' unit, which prosecuted sex crimes.  (Ex. 9, Tr. Prel. Hg. [Nix] at 64, 67).

10. At the time of the incident, Darin Ehrenrich, a lieutenant with the Tulsa Police Department, had recently been reassigned as the lieutenant supervisor over TPD's special victims' unit, which is the group of detectives who investigate sex crimes.  (Ex. 12, Ehrenrich Depo. at 7, 50, 68, 69; Ex. 13, Ehrenrich Declaration, ¶¶1-4).

11. On September 6, 2020, Nix contacted Ehrenrich and informed him of her situation, because he was the supervisor over the SVU, and she knew that the matter would be reported to the SVU detectives.  (Ex. 9, Tr. Prel. Hg. [Nix] at 67-68; Ex. 12, Ehrenrich Deposition at pp. 108-110; Ex. 13, Ehrenrich Declaration, ¶6).

12. Lieutenant Ehrenrich assigned the investigation of the incident to himself, because he felt that as the newest member in the SVU, he would have the least familiarity and work history with Nix, and also he felt it should be handled by a supervisor since the purported victim was an Assistant District Attorney.  (Ex. 12, Ehrenrich Deposition at 108-110, 119-120; Ex. 13, Ehrenrich Declaration, ¶¶7-8).

13. Because Nix was an employee of the Tulsa County District Attorney's Office, that office recused itself from any involvement in the investigation or prosecution.  The Oklahoma Attorney General's Office referred the matter to the Payne County District Attorney's Office.  (Ex. 13, Ehrenrich Declaration, ¶10; Ex. 14, Vincent Declaration, ¶3).

14. Ehrenrich's investigation began on September 8, 2020, and was completed November 23, 2020.  His investigation included:

- Interviews for the following people:

6

- o Ashley Nix, the alleged victim;
- o Jonathan Hood, a tattoo artist that Nix had an appointment with earlier in the evening of September 5, 2020;
- o Nathan Wood, the bartender at Oren's Restaurant;
- o Spencer Snow, the bartender at Doc's Restaurant;
- o Jeffrey Dickason, the acquaintance who drove Nix home;
- Search warrant was obtained and executed at Hankins' residence, and the following evidence was seized:
  - o Two I-Phones;
  - o Two I-Pads;
  - o Two Mac Book Laptops;
  - o Multiple unidentified yellow, round pills/tablets;
  - o Multiple small bottles containing an unidentified clear viscus liquid;
  - o One digital video recording (DVR) unit;
  - o A Buchal swab of the inside of Hankins' mouth for DNA purposes.
- Download and forensic analysis of Nix's cell phone;
- Receipt and review of Sexual Assault Information Report of Ashley Dollins, R.N.;
- Receipt and review of original Incident Report of TPD Officer T.K. Talley;
- Download and analysis of Hankins' cell phones;
- Download and analysis of surveillance recordings from Hankins' residence, "driveway camera" and "patio camera";
- Download and analysis of "RING" video recording of Nix's residence, front porch camera and back porch camera;
- Forensic laboratory DNA analysis showing that Hankins cannot be excluded as a contributor of male DNA obtained by external genitalia swabs from Ashley Nix, and also showing that Hankins cannot be excluded as a contributor of male DNA found by vaginal swabs of Ashley Nix;[4]
- Forensic lab analysis of Nix's blood/urine samples obtained during SANE exam, which showed the presence of amphetamines and blood alcohol level of 0.180.

(Ex. 13, Ehrenrich Declaration, ¶¶9-12; Ex. 3, TPD Supplemental Offense Report

[Ehrenrich]; Ex. 4, TPD Forensic Laboratory Analysis Reports; Ex. 7, Search Warrant).

15.    Ehrenrich prepared a Supplemental Offense Report setting forth a summary of his

investigation.  (Ex. 3; Ex. 13, ¶9).

16.    Based on the entirety of his investigation, Ehrenrich believed there was probable cause to

believe Hankins had committed the crimes of rape and/or sexual assault against Nix.  (Ex.

---

[4] Further DNA analysis of OSBI confirmed Hankins' DNA match, finding the probability of someone other than Hankins was 1 in 16 octillion for the vaginal swab and 1 in 1.8 sextillion for the swab of the genitalia.  (Ex. 5, OSBI Forensic Lab Report; Ex. 10, Tr. of Jury Trial [OSBI Criminalist Samantha Campenni-Hurt] at 294; 313-315).

8, Probable Cause Affidavit; Ex. 12, Ehrenrich Deposition at 292:13-18; 418:1-21; 420:16-20; Ex. 13, Ehrenrich Declaration, ¶13).

17.   Ehrenrich provided the Payne County District Attorney's Office his entire investigation file, and he was in communication with and providing information to the District Attorney's Office during the investigation.   (Ex. 13, Ehrenrich Declaration, ¶¶11-12; Ex. 14, Vincent Declaration, ¶4, 5; Ex. 10, Tr. of Jury Trial at 41-42).

18.   Payne County District Attorney's Office received and reviewed Ehrenrich's entire investigation file.  (Ex. 14, Vincent Declaration, ¶¶5, 6).

19.   Based on all of the available information, the Payne County District Attorney's Office made the independent decision to file felony charges against Hankins for Rape in the 1st Degree or in the alternative Sexual Battery, and asked Ehrenrich to prepare a Probable Cause Affidavit.  (Ex. 14, Vincent Declaration, ¶9).

20.   Ehrenrich drafted the Probable Cause Affidavit and submitted it to Assistant District Attorney Debra Vincent, who reviewed it for accuracy and completeness.  (Ex. 8, Probable Cause Affidavit; Ex. 13, Ehrenrich Declaration, ¶14; Ex. 14, Vincent Declaration, ¶10).

21.   After submitting the Probable Cause Affidavit to the Payne County District Attorney's Office, Ehrenrich had no further involvement in the decision to file charges against Hankin. (Ex. 13, Ehrenrich Declaration, ¶14; Ex. 14, Vincent Declaration, ¶11).

22.   On November 23, 2020, Payne County prosecutors presented the Probable Cause Affidavit to Tulsa County Judge David Guten, who reviewed the PC Affidavit and determined there was probable cause to arrest Hankins on charges of first-degree rape or in the alternative sexual battery.  Prosecutors filed the original Information on November 23, 2020.  Judge Guten signed the warrant for Hankins' arrest.  (Ex. 14, Vincent Declaration, ¶12; Ex. 13, ¶14; Ex. 8 at 2 ["Finding of Probable Cause"]; Exhibit 19, Judgment Roll at 2 [Information]; at 6 ["Finding of Probable Cause"]; at 17 [Felony Warrant]).

23.     On or about April 27, 2021, Payne County prosecutors amended the charges to drop the sexual battery charge and added rape by instrumentation.  (Ex. 14, Vincent Declaration, ¶13; Ex. 19, Judgment Roll at 46 [First Amended Information]).

24.     On April 21, 2021 and May 19, 2021, Tulsa County District Court Judge Tonya Wilson conducted a preliminary hearing in Case No. CF-2020-5224.  At the preliminary hearing, numerous witnesses testified, and Hankins' attorney cross-examined witnesses and presented witnesses and evidence on Hankins' behalf.  All of the surveillance video of the interactions between Nix and Hankins were admitted into evidence and reviewed by Judge Wilson.  At the conclusion of the preliminary hearing and after reviewing all of the evidence, Judge Wilson found probable cause that Hankins had committed the crime of rape in the first degree as well as rape by instrumentation, and he was bound over for trial.  (Ex. 9, Tr. Prel. Hg. at 192:4-21; Ex. 14, Vincent Declaration, ¶14).

25.     On July 6, 2021, in CF-2020-5224, Hankins filed a Motion to Quash Evidence Adduced at Preliminary Hearing, again seeking to have the case dismissed but, on August 4, 2021, Judge Clifford Smith heard arguments on said motion and overruled same.   (Ex. 19, Judgment Roll at 61; Ex. 19 at p. vi [docket sheet], Minute Order dated 08-04-2021 ["Court Overrules Motion to Quash"]).

26.     On April 26-29, 2022, Case No. CF-2020-5224 was tried to a jury before Tulsa County District Judge Clifford Smith.  At the close of the State's case, Hankin demurred to the evidence and moved for directed verdict.  Judge Smith denied Hankin's motion, finding there was sufficient evidence to submit the case to the jury.  Ultimately, the jury acquitted Mr. Hankins.  (Ex. 10, Tr. of jury trial at 294-297; 438-439; Ex. 14, Vincent Declaration, ¶15; Ex. 19, Judgment Roll at 198; at 196 [Minute Order]).

## II.     ARGUMENTS AND AUTHORITIES

### A.     LEGAL STANDARDS

*Summary judgment*.    Summary judgment pursuant to Fed. R. Civ. P. 56 is appropriate where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986).   The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, 477 U.S. at 317.  Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586-87 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the [trier of fact] could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

*Qualified immunity*.  Plaintiff has pursued a § 1983 claim against Defendant Ehrenrich in his individual capacity.  (Doc. 2).  Section 1983 provides a cause of action against any "person who, under color of statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and law" of the United States.   However, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Qualified immunity shields public officials from facing the burdens of litigation and is an immunity from suit, not simply a defense to a plaintiff's claims. *Serna v. Colorado Dept. of Corrections*, 455 F.3d 1146, 1150 (10th Cir. 2006).  The Tenth Circuit applies a two-step analysis to determine if a defendant is entitled to qualified immunity.  A plaintiff must prove that the defendant's actions violated a specific constitutional right and, if the plaintiff has

shown that a constitutional violation occurred, the plaintiff must show that the constitutional right was clearly established when the conduct occurred. *Toevs. v. Reid*, 685 F.3d 903 (10th Cir. 2012). Plaintiff bears the "heavy burden" burden to prove that his constitutional rights were violated and that the law giving rise to his claim was clearly established at the time the acts occurred. *Cox v. Glanz*, 800 F.3d 1231, 1246 (10th Cir. 2015); *Medina v. Cram*, 252 F.3d 1124 (10th Cir. 2001).

## A. DEFENDANT EHRENRICH IS ENTITLED TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT "FALSE ARREST" CLAIM

In this case, Plaintiff has pursued a Fourth Amendment claim for "wrongful/unreasonable arrest/seizure" against Defendant Ehrenrich. (Doc. 2, ¶¶108-121). Plaintiff claims that Ehrenrich "effectuated the seizure of Mr. Hankins' person without probable cause." (*Id.* at ¶119). Plaintiff testified that his claim against Ehrenrich is based solely on Ehrenrich's failure to include additional (alleged "exculpatory") information in the Probable Cause Affidavit. (Ex. 8; Ex. 11, Hankins Deposition at 176-177). For the following reasons, Defendant is entitled to qualified immunity:

### 1. Defendant Ehrenrich Did Not Violate Plaintiff's Fourth Amendment Constitutional Rights

Officers must have probable cause to initiate a search, arrest, and prosecution under the Fourth Amendment. *Stonecipher v. Valles*, 759 F.3d 1134, 1141–42 (10th Cir. 2014). Probable cause is not a precise quantum of evidence – it does not, for example, "require the suspect's guilt to be 'more likely true than false.' Instead, the relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'" *Id.* (citing *Kerns v. Bader*, 663 F.3d 1173, 1188 (10th Cir. 2011) (citations omitted); *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) ("As the standard itself indicates, probable cause does not require metaphysical certitude or proof beyond a reasonable doubt. Probable cause is a matter of probabilities and common sense conclusions, not certainties. At the same time, probable cause requires, of course, more than mere suspicion that unlawful activity is afoot." (internal citations omitted)).

11

In the context of a qualified immunity defense on an unlawful search or arrest claim, the Court ascertains whether a defendant violated clearly established law "by asking whether there was 'arguable probable cause'" for the challenged conduct. *Kaufman*, 697 F.3d at 1300. Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. *Cortez v. McCauley*, 478 F.3d 1108, 1120 (10th Cir. 2007). A defendant "is entitled to qualified immunity if a reasonable officer could have believed that probable cause existed to arrest or detain the plaintiff." *Id.*

A neutral magistrate judge's issuance of a warrant is "the clearest indication that the officers acted in an objectively reasonable manner or ... in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quoting *U.S. v. Leon*, 468 U.S. 897 (1984)). But "the fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Id.* If "it is obvious that no reasonably competent officer would have concluded that a warrant should issue," the warrant offers no protection. *Malley v. Briggs*, 475 U.S. 335, 341 (1986). The burden is on the plaintiff to "make a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant. *Snell v. Tunnell*, 920 F.2d 673, 698 (10th Cir. 1990). This test is an objective one: when there is no dispute over the material facts, a court may determine as a matter of law whether a reasonable officer would have found probable cause under the circumstances. *Cortez*, 478 F.3d at 1120-21. Qualified immunity applies equally to reasonable mistakes of law and fact. *See Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009).

To establish "reckless disregard" in the presentation of information to a magistrate judge, "there must exist evidence that the officer in fact entertained serious doubts as to the truth of his allegations ... and [a] factfinder may infer reckless disregard from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994). "[T]he failure to investigate a matter fully, to exhaust every possible lead,

interview all potential witnesses, and accumulate overwhelming corroborative evidence rarely suggests a knowing or reckless disregard for the truth. To the contrary, it is generally considered to betoken negligence at most." *Id.* (cites omitted); *Stonecipher v. Valles*, 759 F.3d 1134, 1141–42 (10th Cir. 2014). With respect to "omitted" information, Plaintiff must show that any such information was "material" in that its inclusion would have vitiated probable cause for issuing the warrant. *See Kapinski v. City of Alburquerque*, 964 F.3d 900 (10th Cir. 2000). In addition, Plaintiff must show that Ehrenrich acted with the requisite mental state in omitting the information. *Id.*

### a. Plaintiff is Estopped from Re-Litigating the Issue of Probable Cause

First, Plaintiff is estopped from re-litigating the issue of probable cause, and therefore, Plaintiff is unable to establish a fundamental element of his claim. Pursuant to 28 U.S.C. § 1738, a federal court must give the same full faith and credit to state judicial proceedings "as they have by law or usage in the courts of such State ... from which they are taken." 28 U.S.C. § 1738; *Allen v. McCurry*, 449 U.S. 90, 96 (1980). Because the preclusive effect of a prior state court judgment is defined by that state's law, the Court must look to Oklahoma law to determine whether a probable cause finding in a criminal proceeding resulting in an acquittal collaterally estops consideration of that issue in a civil case. *Haring v. Prosise*, 462 U.S. 306, 314 (1983); *Hubbert v. City of Moore*, 923 F.2d 769 (10th Cir. 1991).

In *Hubbert*, the Tenth Circuit, construing Oklahoma law, addressed the very situation confronting the Court in this matter. In that case, the plaintiff had been prosecuted in state court for "assault with a dangerous weapon." In the state court proceedings, a preliminary hearing was held where various witnesses testified and were cross-examined by the plaintiff's counsel. The state judge ultimately "determined there was probable cause for the arrest" and the plaintiff was "bound over for trial." *Id.* at 771. The plaintiff was later acquitted by the jury, and she then sued the defendant-officers under §1983. The District Court rejected the defendant-officers' qualified immunity defense but, by way of an interlocutory appeal, the Tenth Circuit reversed and held that

the defendant-officers were *entitled to qualified immunity as a matter of law*. *Id.* at 773. The Court noted that, per *Allen*, *supra*, the estoppel issue was governed by Oklahoma law, and that Oklahoma law provides for the "preclusive effect of a probable cause finding at a preliminary hearing." *Id.* at 773. According to the Court:

> Our review of the record, however, reveals no genuine dispute about whether Mrs. Hubbert had an opportunity to fully and fairly litigate the issue. Her counsel had ample opportunity to present evidence, review evidence the prosecution presented, and cross-examine the witnesses against her. We hold no genuine issue of material fact remains because probable cause was fully and fairly litigated in the prior criminal proceeding and cannot be relitigated in this civil action. We conclude Doran and McCoy had probable cause to make the arrest and thus are entitled to qualified immunity from liability in the Hubberts' section 1983 action. *Id.*

The *Hubbert* Court relied on *Adamson v. Dayton Hudson*, 774 P.2d 478 (Okla. App. 1989), where the court held the plaintiff had a full and fair opportunity to litigate the question of probable cause at an underlying preliminary hearing and was thus estopped from relitigating the issue in the civil suit. *Id.* at 480. And, since the time of *Hubbert* and *Adamson*, many courts have issued similar rulings: *Christopher v. Circle K Conv. Stores, Inc*., 937 P.2d 77, 79 (Okla. 1997) (citing *Hubbert* and holding an order at preliminary hearing binding over the defendant for criminal trial precludes re-litigation of the issue of probable cause in suit for false arrest); *Robinson v. Goodner's Wholesale*, 50 P.3d 1149 (Okla. Civ. App. 2002); *Gamel-Medler v. Pauls*, 2019 WL 11278465, at *5 (W.D. Okla. 2019) ("As a result, principles of issue preclusion bind plaintiff here on the issue of whether probable cause was or was not present — it was."); *Craig v. City of Hobart*, 2010 WL 680857, at 4 (W.D. Okla. 2010); *Cook v. Aagard*, 547 Fed. Appx. 857 (10th Cir. 2024) (Utah law).

Here, it is undisputed that Plaintiff had a full and fair opportunity litigate the issue of "probable cause" during the preliminary hearing in the underlying criminal case. (Ex. 9, Tr. Prel. Hrg). The presiding judge, over the course of two days, heard the evidence and arguments of counsel and ultimately held that probable cause existed for Plaintiff's arrest and bound him over for trial. (Ex. 9 at 192:4-21; 192:20-21) ("[T]he Court finds that Mr. Hankins should be bound

over."). In addition, the trial judge later denied a related "Motion to Quash." (Uncontroverted Fact ["UF"] 24-25). Plaintiff is estopped from re-litigating "probable cause." *See Hubbert, supra*.[5]

This is not a case where Plaintiff was denied a full and fair opportunity to litigate probable cause in his criminal case. Plaintiff was represented by a well-known/experienced trial counsel, and was allowed to introduce evidence, make legal arguments, and call/cross-examine witnesses (including Scott Gibson, Eric Leverington, Ashley Nix, Spencer Snow, Tony Talley, Ashley Dollins and Ehrenrich. (UF 24; Ex. 9). Plaintiff was allowed to cross-examine his prime accuser (Ashley Nix) *and* Ehrenrich. (*Id.*). Further, the transcript shows that numerous evidentiary issues were discussed (or could have been discussed), including all of the 19 alleged "exculpatory" facts that Plaintiff relies upon to support her false arrest/seizure claim. (Doc. 2, ¶93). For instance:

(1)    Regarding an alleged "pre-existing" relationship, Ehrenrich and Nix both testified, and Plaintiff could have inquired about any alleged "pre-existing professional relationship." In fact, Plaintiff's trial counsel did ask specific questions of Ehrenrich regarding their "professional relationship." (Ex. 9 at 179-180).

(2)    Regarding the "number of drinks" consumed by Nix, she testified on direct examination about the amount of alcohol she consumed, and Plaintiff's trial counsel cross-examined her extensively on this issue. (Ex. 9 at 50-51; 79-80; 96-101). The toxicology report (showing blood alcohol content) was admitted into evidence. (*Id.* at 183-84).

(3)    Regarding Ms. Nix's "memory loss," Plaintiff's trial counsel cross-examined Nix specifically on this issue during the preliminary hearing. (Exhibit 9 at 79-80). The prosecutor also covered the issue on re-direct examination. (*Id.* at 116-117).

(4)    Regarding Nix "willingly" going to Plaintiff's house and having "physical contact" in the kitchen, Nix testified about what occurred inside Hankins' house. (Exhibit 9 at 52-56). Plaintiff's trial counsel cross-examined her and specifically addressed with Nix the events preceding the trip to Plaintiff's house and events occurring at Plaintiff's house. (*Id.* at 101-102; 107-109). Plaintiff's counsel argued strenuously that Nix "was the one who initiated the physical contact with Mr. Hankins" and that "everything that – that is on that tape indicates a consensual act by Ms. Nix, and there is no indication of any force or even any enticement by Mr. Hankins to do anything." (*Id.* at 187:15-16; 187-188).

(5)    Regarding whether the lab tests showed "no drugs, aside from a prescription amphetamine, in Ms. Nix's system," Plaintiff's trial counsel cross-examined Nix extensively on this issue. (Exhibit 9 at 111-112). The toxicology report was admitted. (*Id.* at 183-184).

---

[5] Defendant has submitted a Judgment Roll herewith, consistent with Oklahoma law for the invocation of the estoppel defense. (Exhibit 19).

(6)    Regarding the lab analysis and whether Nix had "DNA from at least two other males on her body," the complete forensic lab DNA report was admitted into evidence.  (Ex. 9 at 183-84).  A TPD officer testified about the DNA swabs from Hankins, (*id.* at 9-10), and Ehrenrich testified that he obtained Buccal swabs from Hankins.  (*Id.* at 178).

(7)-(10) These statements all relate to the surveillance video from Hankins' house.  At the hearing, State's Exhibit 2 was the complete video which was admitted into evidence without objection.  (Ex. 9 at 56-58).  Plaintiff successfully admitted Hankins' entire video.  (*Id.* at 94-96).  Officer Leverington testified regarding seizing, processing and copying the video, (*id.* at 25-33), and he was cross-examined extensively on the "missing" 3 to 6 minutes.  (*Id.* at 33-46).  Nix testified on direct regarding the information seen on the video.  (*Id.* at 56-60).  Plaintiff's trial counsel cross-examined Nix about information on the video.  (*Id.* at 103-110).

(11)-(13) These statements all relate to the RING video on Nix's front porch.  The videos were admitted into evidence for the state court judge to review.  Nix testified regarding the RING video and the activities on her porch.  (Ex. 9 at 74-76; 91-96; 110, 115-116).

(14)-(17) These paragraphs relate to information that Nix gave to the SANE nurse (Dollins) and/or the investigator (Talley).  Nix testified about all of these issues on direct examination and cross-examination.  (Ex. 9 at 65-73; 113-114).  The SANE nurse testified extensively about her exam and was subject to cross-examination.  (*Id.* at 150-174).  Talley testified regarding information provided to him by Nix, as well as his own interaction with Nix, and was subject to cross-examination.  (*Id.* at 131-142).

(18)    Regarding the lack of a "rape drug," Nix testified regarding her blood/urine analysis and the fact that only alcohol and a prescription amphetamine were found.  (Ex. 9 at 111-112).  The toxicology report was admitted.  (*Id.* at 183-184).

(19)    Regarding Nix's text message to Hankins asking about her keys, the messages were identified in Hankins' Exhibits 14 and 15 at the preliminary hearing and Nix testified about those texts.  (Ex. 9 at 89-91; 66).  The SANE nurse (Dollins) also testified about her demeanor and behavior while at Hillcrest.  (Ex. 9 at 155-156).

In short, Plaintiff was allowed a full and complete opportunity to litigate the probable cause issue in state court, and – indeed – had every reason to litigate that issue vigorously.  For that reason, the state court's probable cause finding is accorded preclusive effect.  *See Hubbert, supra.*

### b.  Probable Cause Existed for Plaintiff's Arrest

Further, based on Erhenrich's investigation and the facts identified in his Probable Cause Affidavit, probable cause in fact existed, thereby precluding a false arrest claim.  (UF 13-16).  Hankins was charged with rape in the first degree (21 O.S. §§1111(A)(5), 1114(A)(4)) and sexual

battery (21 O.S. §1123(B)(1)). The "rape in the first degree" charge required a showing of (i) sexual intercourse (ii) with a person who is not the spouse of the defendant and (iii) where the victim is, at the time, unconscious of the nature of the act and this fact is known to the accused; or where the victim was intoxicated by a narcotic or anesthetic agent given by the defendant as a means of forcing the victim to submit. OUJI-CR 4-120. The "sexual battery" charge required a showing that the defendant intentionally touched in a lewd or lascivious manner the body or private parts of a person over sixteen years of age without his/her consent. OUJI-CR 4-130.[6]

In this case, Ehrenrich's Supplemental Offense Report, (Ex. 3), and Probable Cause Affidavit, (Ex. 8), provide a detailed discussion of his investigation of the facts of this matter, which substantiated probable cause for the referenced crimes. (UF 13-16). The investigation showed that, based on Nix's allegations and the objective evidence, evidence existed that Hankins likely had intercourse with Nix at a time when she was unconscious of the nature of the act, and/or did not provide Hankins with consent. (UF 7-8). The DNA analysis of an external genitalia swab and a vaginal swab of Nix showed that Hankins could not be excluded as a contributor of male DNA. (UF 13). Likewise, Nix's blood alcohol content was .18 at the time of the SANE exam. (UF 13). Further, Nix stated, on several occasions, that she blacked out and had lapses of memory, which supported the "unconscious of the nature of the act" element. The Hankins' video (Ex. 16) also supported this element, as it showed Nix being noticeably impaired, falling down, and/or falling asleep/losing consciousness. At a minimum, Ehrenrich was in possession of evidence supporting the reasonable conclusion that Nix was incapacitated at the time of the events.[7]

---

[6] The First Amended Information, (Ex. 19 at 46), dropped the "sexual battery" charge, but added "rape by instrumentation," (21 O.S. §1111.1). At the subsequent jury trial, this charge was dropped after Hankins admitted to having sexual intercourse with Nix. (Ex. 10 at 539). Only the rape charge was given at the jury trial. (*Id.*; Ex. 19 at 181).

[7] Judge Smith later found that the issue of being "incapacitated" is a "job for the finder of fact." (Exhibit 10 at 297:5-12 [overruling demurrer]; 439:13-18 [denying directed verdict motion]).

As part of his investigation, Ehrenrich interviewed numerous individuals and executed a search warrant at Hankins' residence. (UF 14). Nix reported to the SANE nurse that she had been possibly drugged and sexually assaulted. (Ex. 1 at 00009; Ex. 9 at 168:10-17; 170:19-23). Nix reported similar information to TPD officer Talley, including discussions of blacking out, but recalling waking up to "Hankins inside of her, then blacked out again." (Ex. 2 at 00002-3). Nix, at that time, stated that "she may very well have been drugged and victimized." (*Id.*). Nix provided information to Ehrenrich during his interview with her. (Ex. 3 at 00018-21). Her memory was "blurry," but she had a "vague recollection of her sitting on a counter, and Hankins trying to have sex with her." (Ex. 3 at 00020). She found a large amount of bruising on her body. (*Id.*; Ex. 9 at 68-69; 73-74; 113:11-14). The Oren's bartender stated that Nix's demeanor changed dramatically after Hankins arrived. (Ex. 3 at 00026). Likewise, as noted, in the Hankins' video, Nix showed signs of intoxication; she fell into the bushes; she couldn't hold her head up; she possibly fell asleep; and the video showed her with her underwear in her hand. (Ex. 16; Ex. 9 at 105-106; 109:17-21). The RING video (at the Nix residence) showed her with no keys, her underwear in her purse, and she had difficulty standing. (Ex. 17; Ex. 9 at 116:1-11).

At the preliminary hearing, Nix recounted these events. (Ex. 9 at 47-119). She indicated that, after Hankins arrived at Oren, her demeanor changed, and she started having lapses in her memory. (Ex. 9 at 51:15-18; 52). She discussed her memory of being on top of a countertop at Hankins' house; that Hankins was touching her all over her body and trying to take her clothes off; that his shorts were down and he "had his penis out" and "[h]e was trying to insert it into my vagina." (Ex. 9 at 54-55).[8] She fell off the counter and hit the floor. (*Id.* at 55). She had a memory of "him pressed up against" her but could not recall specifically what happened. (*Id.* at 55:23).

---

[8] She rendered the same testimony at the subsequent jury trial. (Ex. 10 at 159-160). Hankins refused to be interviewed during the investigation. (Ex. 11 at 78-80). At trial, Hankins testified for the first time, and he agreed they had sexual intercourse in his house that night (inclusive of vaginal penetration and ejaculation). (Ex. 10 at 387:10-16; 395; 413; 414:20-25; 415; 425-26). But, in defense, Hankins claimed that Nix was the aggressor. (*Id.* at 386:24-25; 384-387).

She later became concerned later that night, after finding her underwear in her purse, remembering him "touching" her, and remembering falling down a lot.  (*Id.* at 64:11-14).  On cross-examination, she again stated that he was "[j]ust trying to put his penis inside of me.  And there was – he dragged me by my arm.  He pulled my arm behind my back."  (*Id.* at 113-114).  Spencer Snow, the Doc's server, discussed Nix's demeanor after Hankins dropped her off ("incoherentness"), and noted she "started panicking and crying, saying she didn't want to go with him.  She didn't want to go back outside."  (*Id.* at 123:22-24; 125:8).  Hankin refused to pick her up after Snow called him.  (*Id.* at 126).  Other witnesses, including Talley, SANE nurse Dollins, and Ehrenrich provided testimony as well, all of which was generally consistent with the information in Ehrenrich's Supplemental Report and Probable Cause Affidavit.  (Ex. 9; Ex. 3; Ex.8).

Based on these facts, a "substantial probability" existed that Hankins had committed a crime.  *Stonecipher*, 759 F.3d at 1141-42.  Ehrenrich certainly had more than a "bare suspicion" that a crime had been committed.  *Id.*  Further, the facts were presented to the DA and the DA independently elected to file felony charges against Hankins.  (UF 19).  The facts were also presented to District Judge Guten, who also found that probable cause existed, and issued a warrant for Hankins' arrest.  (UF 22).  The finding of a "neutral magistrate" is the "clearest indication" that Ehrenrich acted in an "objectively reasonable manner."  *Messerschmidt,* 132 S. Ct. at 1245.

In his Complaint, Plaintiff asserts that Ehrenrich should have known that there was no evidence of "nonconsensual sexual contact," (Doc. 2, ¶88), but this is incorrect as Nix made a report of a sexual assault.  (UF 7-8).  The Hankins video also shows that Nix loses her balance and possibly falls asleep/loses consciousness.  (Ex. 16).  Plaintiff asserts that Ehrenrich had no evidence that Nix was intoxicated by a narcotic or anesthetic agent, (Doc. 2, ¶89), but this is incorrect as Nix reported to the SANE nurse and Officer Talley that she might have been drugged; Nix reported to having black-out issues and substantial lapses in her memory.  (UF 7-8).  Plaintiff asserts that Ehrenrich never had evidence that Nix was "unconscious of the nature of the act,"

(Doc. 2, ¶90), but this is incorrect because Nix repeatedly discussed her memory lapses and inability to recall the events of the night. (UF 7-8). At the jury trial, Judge Smith denied a demurrer because fact questions existed on this very issue. (Exhibit 10 at 297:5-12). Plaintiff claims that there is no evidence that it was "known" to Hankins that Nix was "unconscious of the nature of the act," (Doc. 2, ¶91), but this is incorrect because the statements of Nix, if true, would give Hankins notice that Nix was unconscious of the "nature of the act." (*E.g*., Ex. 9 at 189-191 [State's argument on this issue]; Ex. 12 at 345-347; 406-411 [discussion of alcohol as common date-rape "drug" and its presence alone supported probable cause, and sleeping pills and other over-the-counter drugs can also be used]).

As noted above, Plaintiff also complains about 19 alleged "exculpatory" facts that were "omitted" from the Probable Cause Affidavit. (Doc. 2, ¶93). But, even assuming these facts were included, they would not have "vitiated probable cause for issuing the warrant." *Kapinski*, 964 F.3d at 905. A Court is not required to defer to a plaintiff's own "interpretation" or "characterization" of evidence in consideration of whether probable cause exists. *Id.* at 906-07. With respect to the 19 "facts": *(1.)* a pre-existing professional relationship between Ehrenrich and Nix was immaterial to probable cause. Further, Nix's version of the events (as stated to Ehrenrich) was consistent with her statements to the SANE nurse, and TPD officer Talley, and consistent with her statements at the preliminary hearing. (UF 7-8; Ex. 9 at 47-119). *(2.)* The probable cause affidavit does not identify the number of drinks consumed by Nix. (Ex. 8). Further, there is no evidence that this statement ("one or two" drinks) was a "lie" or that such a statement would vitiate probable cause. *(3.)* Nix's alleged "memory loss" while drinking would not vitiate probable cause. Nix was consistent in her testimony that she experienced memory lapses during the evening. (UF 7-8; Ex. 9 at 51:16-20). Further, the probable cause affidavit indicated she had been "drinking" with Hankins and then "began to black out and that everything went from 'so clear, to so not clear.'" (Ex. 8; UF 14-16). *(4.)* Plaintiff alleges that Nix "willingly" went to Mr. Hankins' house

and had physical contact with him in the kitchen. But, this appears to be Hankins' version of events – which was not revealed until the jury trial of this matter. (*E.g.*, Ex. 10 at 395). Nix was consistent in stating that she was "having difficulty functioning" and "knew [she] needed to go home," and remembers being in a vehicle and "falling asleep in the car." (Ex. 9 at 52:5-10). Further, even assuming she "willingly" went to Hankins' house, this fact did not preclude a subsequent sexual assault. *(5. and 18.)* The probable cause affidavit did not reference any drugs other than alcohol; the affidavit does accurately identify her blood alcohol content. (Ex. 8). Further, the absence of any positive test results for a "date rape" drug was not dispositive as confirmed by Allie Timmons, OSBI criminologist-toxicologist, because there is no existing test for GHB (a common date-rape drug). (Ex. 10 at 282-292; 289:19-21). Further, alcohol and over-the-counter medication can be used as date-rape "drugs." (Ex. 12 at 345-347; 406-411 [discussion of alcohol as common date-rape "drug"]). In addition, Hankins had possession of other liquids that were packaged unusually and never positively identified. (Ex. 12 at 411:12-19; 347:3-9). *(6.)* The fact that Nix had DNA of two other men (on her chest and neck) did not preclude probable cause; to the contrary, the DNA testing indicated that, with a high degree of probability, Hankins' DNA was found in Nix's vagina and on her external genitalia. (UF 14). *(7-13.)* These paragraphs all relate to Plaintiff's subjective characterization of the video evidence. These characterizations do not dispel or vitiate probable cause. *(14-17.)* These "facts" related to whether Nix said she was "unconscious" during her contact with Hankins or whether she said the sexual act was non-consensual. As noted above, Nix reported a sexual assault, (Ex. 1; Ex. 2), and substantial evidence existed which supported the inference that Nix was incapable of consenting to sexual contact under these circumstances and/or was unconscious of the nature of the fact. (UF 4-8). *(19.)* The probable cause affidavit did not mention the text message sent by Nix to Hankins after the sexual encounter (asking about her keys) but this fact did not vitiate probable cause. A rape could have occurred even assuming Nix asked Hankins about the location of her keys. (Ex. 12 at 347-48).

21

For all these reasons, the omission of these 19 "omitted" facts did not vitiate probable cause. And, because probable cause in fact existed, Plaintiff's "false arrest" claim is without merit.

### c. Ehrenrich Did Not Act With Reckless Disregard for the Truth of the Allegations

To establish this element of his claim, Plaintiff must "demonstrate at least recklessness" on Ehrenrich's part. *Beard v. City of Northglenn*, 24 F.3d 110, 116 (10th Cir. 1994). That is, Plaintiff must show that Ehrenrich "in fact entertained serious doubts as to the truth of his allegations . . . and a factfinder may infer reckless disregard from circumstances evincing 'obvious reasons to doubt the veracity' of the allegations." *Id.* In this case, Plaintiff cannot show that Ehrenrich entertained serious doubts as to the truth of the allegations, or that there were "obvious" reasons to doubt the veracity of the allegations. To the contrary, Ehrenrich's investigation was thorough and complete, (Ex. 3, 8), and he testified that the 19 "omitted" facts identified by Plaintiff in this case did not change his analysis. (Ex. 12 at 418:1-21; 414-421). Plaintiff cannot establish "recklessness" on the part of Ehrenrich.

### 2. The Law Was Not Clearly Established; at a Minimum, *Arguable* Probable Cause Existed for Plaintiff's Arrest

Further, Defendant is entitled to qualified immunity because, at a minimum, *arguable* probable cause existed for Plaintiff's arrest, "a holding borne out by the fact that the trial court bound him over for trial." *Townes v. City of Tulsa, Oklahoma*, 96 Fed. Appx. 656, 657 (10th Cir. 2004). As the Supreme Court often reiterates, courts must not define what is clearly established at a high level of generality. *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015). In the case of alleged "reckless omissions" from a probable cause affidavit, the Court must "examine existing law with a high degree of specificity." *See Kapinski*, 964 F.3d at 910. This is because, "significant ambiguity exists around how the law applies to a particular factual situation." *Id.* Hence, "the context-dependent nature of [the plaintiff's] reckless omission claim necessitates a factually analogous precedent to overcome the clearly established prong of qualified immunity." *Id.* As in

22

*Kapinski,* Plaintiff cannot point to any clearly-established law that would have informed Ehrenrich that the facts he identified in support of his Affidavit of Probable Cause were clearly and obviously inadequate to establish probable cause, or that any "omitted" facts would have clearly and obviously changed his analysis. Ehrenrich consulted with the DA's office concerning his investigation/findings, and they asked him to provide a probable cause affidavit. (UF 17-20). The fact that he made such a consultation supports a finding that Ehrenrich acted in an objectively reasonable manner. *Messerschmidt,* 565 U.S. at 553 (consultation with superior/deputy DA meant "officer could reasonably have believed that the scope of the warrant was supported by probable cause"); *Stonecipher*, 759 F.3d at 1147 (seeking "an independent opinion from a legally trained official" supports qualified immunity). Hence, he is entitled to qualified immunity.

## C. DEFENDANT EHRENRICH IS ENTITELD TO QUALIFIED IMMUNITY ON PLAINTIFF'S FOURTH AMENDMENT MALICIOUS PROSECUTION CLAIM

### 1. Defendant Ehrenrich did Not Violate Plaintiff's Fourth Amendment Constitutional Rights

For many of the same reasons, Plaintiff cannot show that Defendant Ehrenrich violated Plaintiff's Fourth Amendment rights related to his "malicious prosecution" claim. In *Taylor v. Meacham*, 82 F.3d 1556 (10th Cir. 1996), the Tenth Circuit recognized a §1983 "malicious prosecution" action based on the Fourth Amendment. "We conclude that our circuit cases take the common law elements of malicious prosecution as the 'starting point' for the analysis of a §1983 malicious prosecution claim, but always reaches the ultimate question, which it must of whether the Plaintiff has proven a constitutional violation." *Id.* at 1561. "In this context, a Fourth Amendment violation can exist only when a plaintiff alleges the legal process itself to be wrongful." *Wilkins v. DeReyes*, 528 F.3d 790, 798 (10th Cir. 2008). A malicious prosecution claim brought under the Fourth Amendment requires a showing that "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or

23

prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins*, 528 F.3d at 799 (10th Cir. 2008); *Stonecipher*, 759 F.3d at 1146.

### a.    Plaintiff Cannot Show that Probable Cause Was Lacking

In this case, for the same reasons discussed above, Plaintiff is estopped from re-litigating the issue of probable cause. In addition, Plaintiff cannot show that probable cause was lacking. Hence, his malicious prosecution claim is without merit. *Crudup v. Schulte*, 12 Fed. Appx. 682, 685-86 (10th Cir. 2001) (finding that, even assuming plaintiff stated claim for malicious prosecution, "[a] finding of probable cause . . . is fatal to the claim").

### b.    The Probable Cause Findings of the State Criminal Court Broke the Chain of Causation with Respect to Ehrenrich

Even assuming that Plaintiff can establish the common law elements of a malicious prosecution claim, a state court preliminary hearing, "in which a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind [the plaintiff] over for trial," ordinarily breaks the "chain of causation" with respect to an investigating or arresting officer. *Taylor*, 82 F.3d at 1564; *Moon v. City of Shawnee*, 2008 WL 2570949 (W.D. Okla. 2008) (noting that "preliminary hearing broke the 'chain of causation.'"). Hence, the findings of Judge Wilson at the preliminary hearing, (Ex. 9 at 192:4-21), and Judge Smith at the jury trial, (Ex. 10 at 294-297; 438-39), broke the causation chain with respect to Ehrenrich. He is therefore entitled to qualified immunity.

### c.    Defendant Ehrenrich Did Not Act with Malice

Further, Plaintiff cannot show that Ehrenrich acted with malice in his investigation of this matter. The Tenth Circuit has held that "the malice element of a Fourth Amendment malicious prosecution claim focuses on the defendant officer's knowledge or state of mind," *Mglej v. Gardner*, 974 F.3d 1151, 1171 (10th Cir. 2020), and it may be inferred from either a defendant's intentional or reckless conduct, *Stonecipher*, 759 F.3d at 1146, or " 'if a defendant causes the prosecution without arguable probable cause'" *Mglej*, 974 F.3d at 1171. There must be some

"intent to abuse the legal process for extraneous improper purpose." *Reeves v. Chafin*, 547 F. Supp.3d 1056, 1080 (D.N.M. 2021). Here, there is not a scintilla of evidence that Ehrenrich was motivated by malice or improper purpose. To the contrary, his investigation was thorough, and certainly more than adequate to support probable cause. (Ex. 3; Ex. 8; Ex. 9 at 175-184 [Ehrenrich testimony at preliminary hearing]; Ex. 10 at 274-294 [Ehrenrich testimony at jury trial]).

## 2.    The Law Was Not Clearly Established

For the same reasons discussed above with respect to the false-arrest claim, the law was not clearly-established regarding a malicious prosecution claim. *Bailey v. Twomey*, 791 Fed. Appx. 724, 734 (10th Cir. 2019) (affirming qualified immunity finding regarding malicious prosecution claim and noting "[w]e need not determine whether the district court applied an arguable or an actual probable-cause standard or which is the correct standard; Bailey's arguments fail under either standard."). That is, even assuming Plaintiff could state a claim for malicious prosecution, Plaintiff cannot show that the law was clearly established such that Ehrenrich would have known that his investigation was inadequate to support probable cause. Plaintiff cannot cite a similar case that would have provided Ehrenrich with any such notice. At a minimum, *arguable* probable cause existed. Hence, he is entitled to qualified immunity.

## III.    CONCLUSION

For the reasons discussed above, the Court should find that Defendant Ehrenrich is entitled to qualified immunity with respect to claims of false arrest and malicious prosecution.

WHEREFORE, premises considered, Defendant Darin Ehrenrich requests the Court grant this Motion for Summary Judgment and award him other appropriate relief.

Respectfully submitted,

**BEST & SHARP**


*s/ Thomas A. LeBlanc*
Thomas A. LeBlanc, OBA #14768
tleblanc@bestsharp.com
Matthew A. Dunn, OBA #33500
mdunn@bestsharp.com
Williams Center Tower 1
One West Third Street, Suite 900
Tulsa, OK 74103
Telephone: (918) 582-1234
Facsimile: (918) 585-9447
*Attorney for Defendant,*
*Darin Ehrenrich*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on 20th day of November, 2024, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants (names only are sufficient):

Daniel E. Smolen, OBA #19943
danielsmolen@ssrok.com
Robert M. Blakemore, OBA #18656
bobblakemore@ssrok.com
Smolen & Roytman, PLLC
701 S. Cincinnati Ave.
Tulsa, OK  74119
Telephone:  918-585-2667
Facsimile:  918-585-2669

*Attorneys for Plaintiff*

Donald E. Smolen, OBA #19944
Michael F. Smith, OBA #14815
Christopher U. Brecht, OBA #22500
Smolen Law, PLLC
611 S. Detroit Avenue
Tulsa, OK 74120
Telephone: 918-777-4529
Facsimile: 918-890-4529
don@smolen.law
michael@smolen.law
chrisbrecht@smolen.law
*Attorneys for Non-Party, Ashley Nix*

Hayes T. Martin, OBA #32059
Assistant City Attorney-Tulsa
hmartin@cityoftulsa.org
T. Michelle McGrew, OBA #20279
Senior Assistant City Attorney
mmcgrew@cityoftulsa.org
City Hall @ One Technology Center
175 E. Second Street, Suite 685
Tulsa, OK  74103
Telephone: (918) 596-7717
Facsimile:  (918) 596-9700

*Attorneys for Defendant,*
*City of Tulsa*

Douglas A. Wilson, OBA #13128
Mike Shouse, OBA #33610
Tulsa County District Attorney Office
218 West Sixth Street, Suite 933
Tulsa, OK 74119
Telephone: 918-596-8795
Facsimile: 918-596-4804
douglas.wilson@tulsacounty.org
Mshouse@tulsacounty.org
*Attorneys for Non-Party Tulsa County District*
*Attorney's Office*


*s/ Thomas A. LeBlanc*