**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| TIMOTHY HANKINS, JR, **Plaintiff,** v. DARIN EHRENRICH and CITY OF TULSA, **Defendants.** | **CASE NO.** 22-CV-515-SEH-CDL |

## OPINION AND ORDER

RAUL M. ARIAS-MARXUACH, United States District Judge.

Pending before the Court are Darin Ehrenrich's ("Ehrenrich" or "Defendant Ehrenrich") *Motion for Summary Judgment* at Docket No. 76 and City of Tulsa's ("Tulsa") *Motion for Summary Judgment* at Docket No. 77. After reviewing the parties' submissions in support and opposition, both *Motions for Summary Judgment* are hereby **GRANTED.**

### I.   BACKGROUND

On November 23, 2020, a felony warrant was issued for Mr. Timothy Hankins Jr.'s ("Mr. Hankins" or "Plaintiff") arrest and he was charged with First Degree Rape under Oklahoma law. (Docket No. 2 ¶ 5). After a trial on the merits, a jury of his peers found Mr. Hankins not guilty, and Plaintiff was acquitted. Id. ¶ 6.

On November 23, 2022, Mr. Hankins filed his *Complaint* against Lieutenant Darin Ehrenrich and the City of Tulsa (collectively,

"Defendants"). (Docket No. 2). Therein, Plaintiff alleged wrongful and unreasonable arrest and seizure and malicious prosecution, both in violation of the Fourth Amendment to the United States Constitution pursuant to 42 U.S.C. § 1983. (Id. ¶¶ 108-130).

On November 20, 2024, Defendants filed individual *Motions for Summary Judgment* seeking the dismissal of the case in its entirety. (Docket Nos. 76 and 77). In his *Motion for Summary Judgment*, Defendant Ehrenrich asserted that he was entitled to qualified immunity with regard to both of Plaintiff's Fourth Amendment claims (*i.e.*, unlawful arrest and malicious prosecution). (Docket No. 76). Moreover, he argued that Plaintiff is estopped from relitigating the existence of probable cause and, in any event, probable cause existed. Id. On its part, the City of Tulsa similarly contends that Plaintiff is estopped from relitigating the determination of probable cause and that Mr. Hankins' claims fail on the merits. (Docket No. 77).

On February 21, 2025, Plaintiff filed separate *Responses in Opposition* to each motion. (Docket No. 92 and 93). On March 12, 2025, Defendants filed individual *Replies*. (Docket Nos. 101 and 102). On May 12, 2025, Defendants also filed a joint *Notice of Supplemental Authority*. (Docket No. 104).

## II.  LEGAL STANDARDS

Summary judgment is proper if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

Civil No. 22-515 (SEH)                                                      3

matter of law. Fed. R. Civ. P. 56(a). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if "under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998) (citing Anderson, 477 U.S. at 242).

The movant "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." Id. at 670-71 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986)). Next, the burden shifts to the non-movant "to go beyond the pleadings" and provide "specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." Id. at 671 (citations and internal quotation marks omitted). Specific facts can be shown "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." Id. (citing Thomas v. Wichita Coca-Cola Bottling Co., 968 F.2d 1022, 1024 (10th Cir. 1992)).

A court must "view the evidence and draw any inferences in a light most favorable to the party opposing summary judgment." Thomas, 986 F.2d at 1024 (citations omitted). A court should review the record *in its entirety* and refrain from making credibility determinations or weighing the evidence. *See* Reeves v. Sanderson

Civil No. 22-515 (SEH)                                                                    4

_Plumbing Prods., Inc._, 530 U.S. 133, 150-51 (2000); Fed. R. Civ. P. 56(c)(3) (a court "need only consider cited materials" but can "consider other materials in the record."). A court should "give credence to the evidence favoring the nonmovant" as well as "uncontradicted and unimpeached" evidence supporting the moving party, "at least to the extent that that evidence comes from disinterested witnesses." _Id._ at 151 (citation omitted). Summary judgment may be proper if the nonmovant's case solely relies on evidence that is "merely colorable or is not significantly probative[.]" _Whatley v. City of Bartlesville, Okla._, 932 F.Supp. 1300, 1302 (N.D. Okla. 1996) (citation omitted). The "mere existence of _some_ alleged factual dispute between the parties will not affect an otherwise properly supported motion for summary judgment." _Scott v. Harris_, 550 U.S. 372, 380 (2007) (quotation omitted) (emphasis in original).

Summary judgment motions filed in the Northern District of Oklahoma are also subject to the Local Civil Rules. Local Civil Rule 56.1 requires that parties include a section in their filings stating their proposed material facts in "concise, numbered paragraphs" with accompanying citations. L. CV. R. 56.1(c), (e). A party's response brief to a motion for summary judgment must include a section responding "to the facts that the movant contends are not in dispute and shall state any fact that is disputed." L. CV. R. 56.1(c). "All material facts" in the movant's statement of

Civil No. 22-515 (SEH)                                                      5
_____

material facts will be admitted for summary judgment purposes "unless specifically controverted by the statement of material facts of the opposing party, using the procedures set forth in this rule." Id. *See* Fed. R. Civ. P. 56(e)(2); Bell v. BOKF, NA, No. 12-CV-28, 2013 WL 1309411, at *2 (N.D. Okla. Mar. 26, 2013) (admitting the movant's statement of undisputed material facts when the non-movant did not comply with Local Civil Rule 56.1).

### III. FINDINGS OF FACT

To make its findings of fact, the Court reviewed Defendants' *Motions for Summary Judgment*, Hankins' *Responses*, Defendants' *Replies*, the exhibits accompanying these documents, and the parties' other filings in the case. (Docket Nos. 76, 77, 78, 79, 92, 93, 94, 101, and 102). The Court makes the following findings of fact after crediting only **material** facts that are properly supported by a record citation and uncontroverted.[1]

1. On or about September 2, 2020, Ashley Nix ("Nix")and Hankins were introduced to each other by a mutual acquaintance at Oren's Restaurant. (Docket Nos. 76 ¶ 1; 77 ¶ 1).

2. Ashley Nix is, and was at the time of the relevant events, an Assistant District Attorney with the Tulsa County District Attorney's Office. At the time of the incident, she was one of the prosecutors assigned to the team of prosecutors,

---

[1] References to a specific Finding of Fact shall be cited in the following manner: (Fact ¶ _).

referred to as the special victims' unit, which prosecuted sex crimes. (Docket Nos. 76 ¶ 9; 77 ¶ 9).

3. On the evening of September 5, 2020, Nix and Hankins arranged to meet at Oren's for drinks. (Docket Nos. 76 ¶ 2; 77 ¶ 2).

4. That same day she had also been trying to arrange a date with Jeff Dickason ("Dickason"), but Dickason was working, whereas Hankins was available. (Docket No. 92 ¶ 6).

5. Hankins arrived at Oren's at approximately 9:45 p.m. Nix was already there and sitting at the bar. Id.

6. Nix and Hankins were together at the bar having drinks for approximately one hour and left the bar together in Hankins' car. (Docket Nos. 76 ¶ 2; 76-2 at 7; 77 ¶ 2).

7. Video footage from inside Oren's bar shows that they each had approximately two drinks. (Docket Nos. 76-18; 93 ¶ 3).

8. At his deposition, Hankins testified that after they left Oren's, Nix kissed him on the mouth and suggested going to his place. (Docket No. 92 ¶ 9).

9. Surveillance video from Hankins' residence shows him and Nix arriving in Hankins' vehicle at his residence at 10:55:32 p.m. and proceeding to walk toward the residence. (Docket Nos. 76 ¶ 3; 77 ¶ 3; 76-16).

10. Hankins testified that after arriving at his house, he and Nix had sexual intercourse on the kitchen counter of his home for approximately 20 minutes. (Docket Nos. 92 ¶ 10; 93 ¶ 5).

Civil No. 22-515 (SEH)                                                    7

11. At approximately 11:14 p.m., Hankins and Nix returned to his vehicle and left his residence briefly. (Docket Nos. 76 ¶ 3; 77 ¶ 3; 76-16).

12. Hankins testified that he drove Nix to the Oren's parking lot to get her car, but Nix then discovered she did not have her keys. (Docket No. 92 ¶¶ 10-11; 93 ¶ 5).

13. Hankins and Nix returned to his residence at 11:21 p.m. (Docket Nos. 76 ¶ 3; 77 ¶ 3; 76-16).

14. A patio camera at Hankins' residence shows Nix and Hankins on the patio from 11:21:40 p.m. until 11:36:20 p.m., at which time Hankins carries Nix into the residence. Id.

15. While on the patio, at approximately 11:22:53 p.m., Nix is seen losing her balance while standing on her own two feet, falling backwards, and tumbling into hedges. Hankins helped her up. Subsequently at 11:25:51 p.m. the footage shows Nix straddling Hankins and them beginning to kiss. (Docket No. 76-16).

16. At 12:01:04 a.m., Hankins and Nix exited the residence, and at 12:04:20 a.m., departed in Hankins' vehicle. (Docket Nos. 76 ¶ 3; 77 ¶ 3; 76-16).

17. Hankins testified that he drove Nix to her residence to look for a spare key. Moreover, he testified that Nix directed him to her house along the way. (Docket No. 92 ¶¶ 14-15).

Civil No. 22-515 (SEH)                                                        8

18. A RING surveillance video at Nix's residence shows that, shortly after midnight, Hankins and Nix approached her front door; they appear to look for Nix's keys in her purse but are apparently unable to find them and immediately leave without entering the residence. (Docket Nos. 76 ¶ 4; 77 ¶ 4).

19. Hankins then drove Nix to Doc's Restaurant, which shares a parking lot and valet with Oren's, in the hope of finding Nix's keys. Nix entered the restaurant alone. Hankins left. (Docket Nos. 76 ¶ 5; 77 ¶ 5).

20. The staff inside Doc's helped Nix secure alternative transportation home, since she was unable to drive herself home. Id.

21. Spencer Snow, an employee at Doc's, called Dickason, with whom Nix had gone on one date before and who agreed to pick up Nix from Doc's. (Docket Nos. 76 ¶ 6; 76-9 at 60; 77 ¶ 6).

22. Dickason testified at trial that when he first saw Nix, she was sitting at the bar and seemed really intoxicated, had trouble staying on her bar stool, slurred her words, and had difficulty walking. (Docket No. 76-10 at 240).

23. Dickason picked up Nix, drove to her home, helped her get into her house through a window, and left her residence shortly thereafter. (Docket Nos. 76 ¶ 6; 76-9 at 60; 77 ¶ 6).

Civil No. 22-515 (SEH)                                                                  9

24. RING video footage from Nix's residence shows her and Dickason on her back porch, playing with her dogs. (Docket No. 92 ¶ 18; 76-16; 93 ¶ 12).

25. At approximately 3:00 a.m. on September 6, 2020, Nix went to Hillcrest Medical Center in order to have a sexual assault exam performed, and to report the assault. (Docket Nos. 76 ¶ 7; 77 ¶ 7).

26. At 3:26 a.m., while waiting for the exam, Nix texted Hankins: "Can you see if you have my keys?" (Docket No. 92 ¶ 24).

27. The sexual assault examination was performed by a sexual assault nurse examiner (SANE), Ashlea Dollins, R.N., ("Dollins") who documented her observations in her report. (Docket Nos. 76 ¶ 7; 77 ¶ 7).

28. Per Dollins' testimony at the Preliminary Hearing, Nix appeared tearful and groggy at the time of the exam. She also had lapses in memory and couldn't remember what had happened. However, Nix did not say she had been unconscious. (Docket No. 76 ¶7; 76-9 at 155-56, 166).

29. Dollins did not notice any physical injuries but did notice blood on the vaginal swabs that appeared bright, typically indicative of active bleeding. (76-9 at 156-157).

30. Per the Sexual Assault Information Form (TUL 4760-1) prepared by Dollins, Nix reported that the assault occurred on the "kitchen countertop at a foreign house, completely dark

Civil No. 22-515 (SEH)                                                      10

inside." She further identified the assailant as a white male acquaintance named Tim. The Form also states that Plaintiff had one or two drinks at the beginning of the night and had possibly been drugged at some point. (76-1 at 2-3).

31. Per Nix's summary of the events recorded in the Sexual Assault Information Form, Nix stated she had met Tim at Oren's and had ordered a drink. She had a drink before arriving but was not remotely drunk. She remembers talking and having a drink and then "everything goes black for a while." Her next memory is wandering around an unfamiliar house that was pitch black, and then sitting on a countertop where she was having sex. The next thing she remembers is walking into Doc's without knowing how she got there or where Tim went. She couldn't find her keys but found her underwear in her bag. A bartender asked if she was ok and helped her call a friend to come pick her up. (76-1 at 4).

32. Nix did not explicitly say that she was raped, sexually assaulted, or that she did not want to have sex with Hankins. (Docket No. 76-1 at 4; 76-9 at 170)

33. The Tulsa Police Department ("TPD") was contacted regarding the SANE exam, and Officer T.K. Talley ("Officer Talley") was dispatched to Hillcrest Medical Center. (Docket Nos. 76 ¶ 8; 77 ¶ 8).

Civil No. 22-515 (SEH)                                                    11

34. At the preliminary hearing, Officer Talley noted that when he first encountered Plaintiff, she appeared to be "somewhat out of it" and had fragmented memories. After the SANE exam was completed, she seemed more coherent and was able to piece things together in chronological order. (Docket Nos. 76 at 8; 76-9 at 133).

35. In the Tulsa Police Department Incident Report prepared by Officer Talley, Nix reported that she did not remember finishing a drink before she began to black out and could only remember pieces of the evening. She recalled being in an empty house with no furniture or light. She recalled sitting on what felt like a kitchen counter with Hankins in front of her. She reported that she woke up to Hankins inside of her. She also remembered searching for her keys, only to find her underwear in her purse, and walking into Doc's where an employee helped her get a ride home. (Docket No. 76 ¶ 8; 76-2 at 2-3).

36. At the time of the event, Defendant Ehrenrich, a lieutenant with the TPD, had recently been reassigned as the lieutenant supervisor over TPD's special victims' unit, the group of detectives who investigate sex crimes. (Docket Nos. 76 ¶ 10; 77 ¶ 10).

37. On September 6, 2020, Nix contacted Ehrenrich and informed him that she had filed a rape report because he was the

Civil No. 22-515 (SEH)                                                      12

supervisor over the SVU, and she knew that the matter would be reported to SVU detectives. (Docket Nos. 76 ¶ 11; 76-12 at 7; 77 ¶ 11).

38. Specifically, Nix texted Ehrenrich at 5:24 a.m. on September 6, 2020 and they spoke by phone at 7:35 a.m. that day. They subsequently exchanged fourteen (14) text messages throughout the day until past 7:30 p.m. that night. Nix was communicating with Ehrenrich via both his personal and official cell phone. (Docket No. 92 at 26).

39. Ehrenrich testified that he assigned the investigation of the incident to himself because, as the newest member of the special victims unit, he felt he had the least interactions and familiarity with Nix. He also felt that because the purported victim was an Assistant District Attorney, the investigation should be handled by a supervisor. (Docket Nos. 76 ¶ 12; 76-12 at 8; 77 ¶ 12).

40. Because Nix was an employee of the Tulsa County District Attorney's Office, said office recused itself from any involvement in the investigation or prosecution. Accordingly, the Oklahoma Attorney General's Office referred the matter to the Payne County District Attorney's Office. (Docket Nos. 76 ¶ 13; 77 ¶ 13).

Civil No. 22-515 (SEH)                                                    13

41. Ehrenrich's investigation began on September 8, 2020, and was completed on November 23, 2020. (Docket Nos. 76 ¶ 14; 77 ¶ 14).

42. Ehrenrich's investigation included interviews of the following people, among others:

- Nix, the alleged victim;

- Jonathan Hood, a tattoo artist that Nix had an appointment with earlier in the evening of September 5, 2020;

- Nathan Wood, the bartender at Oren's Restaurant;

- Spencer Snow, the bartender at Doc's Restaurant;

- Jeffrey Dickason, the acquaintance who drove Nix home;

(Docket No. 76 ¶ 14; 76-3; 77 ¶ 14).

43. During her interview with Ehrenrich, Nix provided the following version of the events of September 5, 2020:

- Nix had two drinks at Oren's earlier in the day, prior to a tattoo appointment.

- She later made plans with Hankins to go to Oren's together in the evening. She arrived a few minutes before he did. They ordered a drink together. She did not remember what they talked about.

- Nix remembered walking out of Oren's with Hankins, being in a car, pulling into a driveway, and then only recalls bits and pieces.

- Nix remembered being in a dark, empty house. She could not see anything but could feel she was on a counter. She remembered that she could not hold her body up and slipped off the counter, hitting the floor.

- Nix then recalled being back at the patio of the house, falling outside, and thinking that Hankins appeared to be mad.

- She felt she could not walk and did not feel well.

- The next thing she remembered is being at Doc's. She recalled being upset and frantic and having bad motor skills. One of the bartenders looked concerned and helped her use her phone to call someone to assist her.

- Nix remembers Dickason arriving, being really nice, and taking her to her home.

- She recalled laughing with Dickason as they tried to figure out how to get into the house. They played with her dogs once she was able to enter. She did not fall.

- Nix recalled asking Dickason to stay but he declined. He gave her a kiss and left.

- Nix remembered taking her makeup off and removing her contacts, things she does not usually do when drunk.

- She later remembered going to her purse and noticing her panties there. She averred that at that moment, the memories of the night came back.

- She did not know what had happened exactly but was really upset.

- She recalled going to Hillcrest to be evaluated by a SANE nurse. She remembered the exam but did not remember the specific questions asked.

- The next day when she woke up, she recalled being in pain and being covered in bruises. She had to go back to the hospital and was provided a sling.

- She remembered Hankins trying to have sex but her memory was blurry and she did not remember having sex.

(Docket No. 92-7).

44. As part of the investigation, a search warrant was obtained and executed at Hankins' residence, where the following evidence was seized:

- Two iPhones;

- Two iPads;

- Two MacBook laptops;

- Multiple unidentified yellow, round pills/tablets;

Civil No. 22-515 (SEH)                                                  16

- Multiple small bottles containing an unidentified clear viscous liquid;

- One digital video recording (DVR) unit;

- A buccal swab of the inside of Hankins' mouth for DNA purposes.

(Docket No. 76 ¶ 14; 76-4; 76-7; 77 ¶ 14).

45. The investigation also included the:

- Download and forensic analysis of Nix's cellphone;

- Receipt and review of the Sexual Assault Information Report prepared by Ashley Dollins, R.N.;

- Receipt and review of original Incident Report prepared by TPD Officer T.K. Talley;

- Download and analysis of Hankins' cell phones and computer;

- Download and analysis of surveillance recordings from Hankins' residence, "driveway camera," and "patio camera";

- Download and analysis of "RING" video recording of Nix's residence, front porch camera, and back porch camera;

- Forensic lab analysis of the blood/urine samples obtained from Nix during SANE exam, which showed the presence of amphetamines and a blood alcohol level of 0.180.

(Docket Nos. 76 ¶ 14; 76-3; 76-4; 76-7; 77 ¶ 14).

46. The investigation also included the Criminalistics Examination Report outlining the results of the Forensic Laboratory DNA of subjects Hankins and Nix. The evidence evaluated was the Sexual Assault Evidence Collection Kit from Nix (containing vaginal swabs, external genitalia swabs, chest/neck swabs, buccal swabs, underwear, and sperm search slide), a brown paper sack listed as containing clothing, and buccal swabs from Hankins. (Docket Nos. 76 ¶ 14; 77 ¶ 14; 76-5 at 1).

47. The analysis of the evidence resulted in the following findings:

- "A partial single source male DNA profile was obtained" from the External Genitalia Swabs – Sperm Fraction. "Hankins cannot be excluded as a potential donor" of male DNA obtained from external genitalia swabs from Nix. "The probability of selecting an unrelated individual at random from the population having this partial DNA profile is at least 1 in 1.81 sextillion."

- The vaginal swabs – sperm fraction DNA profile was a mixture that could be separated into a major component and minor component. "A complete single source male profile was obtained from the major component. The DNA profile from the major component matches the DNA profile

Civil No. 22-515 (SEH)                                                    18

---

obtained from the known buccal swabs from HANKINS (4). The probability of selecting an unrelated individual at random from the population having this DNA profile is at least 1 in 16.1 octillion." Nix "cannot be excluded as a potential contributor to the minor component."

- The Chest/Neck Swabs contained a DNA mixture of at least three individuals. Nix cannot be excluded as a potential contributor and due to the intimate nature of the sample, is presumed to be a contributor. Hankins is excluded as a potential contributor.

- A "partial DNA profile with very limited genetic information was obtained" from the Chest/Neck Swabs – Sperm Fraction. "It is not suitable for interpretation and no conclusions can be made at this time."

- A complete single source Y-STR DNA profile was obtained from the Vaginal Swabs – Epithelial Fraction. The Y-STR DNA profile matches the Y-STR DNA profile obtained from the known buccal swabs from Hankins. Therefore, Hankins (and all his paternal male relatives) are included as a potential donor.

(Docket No. 76-5).

48. Ehrenrich prepared a Supplemental Offense Report setting forth a summary of his investigation. (Docket Nos. 76 ¶ 15; 77 ¶ 15).

Civil No. 22-515 (SEH)                                                          19

49. The Supplemental Offense Report summarizes the toxicology report received, noting that both Nix's blood and urine were analyzed. Ethanol was detected in both her blood and urine. Specifically, her blood alcohol content was 0.18. Amphetamine was detected in her blood. (Docket No. 92-8 at 24-25).

50. The toxicology report also evaluated items found in Hankins' residence. THC was detected in the tablets, and no controlled substances were detected in the liquids. Id.

51. During his deposition, Ehrenrich testified that there were "a bunch of unusual liquids that were packaged weirdly" at Hankins' residence but none of them were positively identified as "date rape drugs." (Docket No. 92-1 at 16-17).

52. Ehrenrich also noted that, in his experience, although there are several common date rape drugs such as Rohypnol, ketamine, and GHB, people can use any type of drug, such as antidepressants, tranquilizers or sleeping aids to overpower a victim and hinder their recollection. Not all these drugs are tested for in toxicology examinations and no such drugs were identified in the blood and urine samples provided by Nix. (Docket Nos. 92-1 at 16-17; 102-1 at 53-56).

53. Based on the entirety of his investigation, Ehrenrich concluded there was probable cause to believe Hankins had committed the crimes of rape and/or sexual assault against Nix. (Docket Nos. 76 ¶ 16; 77 ¶ 16).

54. Ehrenrich provided the Payne County District Attorney's Office with his investigation file and had communications with the Payne County District Attorney's Office regarding the investigation. The investigation file included surveillance video from Oren's Restaurant, video from Hankins' residence, video from Nix's residence, phone records with text messages, the Hillcrest Medical Center SANE exam documentation, the initial police report prepared by Officer Talley, numerous witness interviews and statements, analysis of evidence gathered from Hankins' residence via execution of search warrant, forensic laboratory reports regarding Nix's blood and urine analysis, DNA analysis from Nix's SANE exam and from Hankins, along with other materials and information. (Docket Nos. 76 ¶ 17; 76-14 ¶ 6; 77 ¶ 17).

55. Only one of Ehrenreich's text messages with Nix was provided as part of the investigative file but, as noted above, Nix's phone records reflect that they exchanged more messages. (Docket No. 92-16; 92-10).

56. Prior to making a charging decision, the Payne County District Attorney's Office spoke with Allen Smallwood, attorney for Hankins. (Docket No. 77 ¶ 19).

57. Hankins never made a statement to either the police or the prosecution, until he testified in his defense at the jury trial. Id. ¶ 20.

58. The Payne County District Attorney's Office also interviewed Nix prior to making a charging decision. Id. ¶ 21.

59. After receiving and reviewing the investigation file, the Payne County District Attorney's Office decided to file felony charges against Hankins for Rape in the First Degree or in the alternative Sexual Battery and asked Ehrenrich to prepare the Probable Cause Affidavit. (Docket Nos. 76 ¶¶ 18-19; 77 ¶ 22).

60. Ehrenrich drafted the Probable Cause Affidavit and submitted it to Assistant District Attorney Debra Vincent for her to review. (Docket Nos. 76 ¶ 20; 77 ¶ 23).

61. The Probable Cause Affidavit provides the following summary of Nix and Hankins' interaction on September 5, 2020:

> On 09-05-2020, victim, A.N. [i.e., Nix], agreed to meet with suspect, Timothy Hankins for drinks at Oren's restaurant. Victim stated that she remembers getting to the restaurant and both her and Hankins ordered drinks. Victim reported that after drinking with Hankins that she began to black out and that everything went from "so clear, to not so clear". AN reported that her next clear memory was standing in another bar on Brookside, 'Doc's', not knowing how she got there. The bartender at Doc's arranged for AN to get a ride home. AN stated that she later located her panties in her purse, did not know how they got there when she should have been wearing them, so she arranged transport to Hillcrest Hospital for a SANE exam.

(Docket No. 76-8 at 1).

Civil No. 22-515 (SEH)                                                    22

62. The Probable Cause Affidavit further specifies the individuals interviewed by Ehrenrich that interacted with the victim prior to and after the interaction with Hankins. The Affidavit provides a brief summary of what each individual stated. Specifically, the bartender at Oren's, Nathan Wood, noted that Nix seemed vibrant when she first arrived but seemed tired, lethargic, and her speech had slowed when she left with Hankins. Snow, the bartender at Doc's, stated that Nix appeared very disoriented and very intoxicated when she arrived. Dickason stated that when he arrived at Doc's to help Nix, she was having difficulty maintaining balance, her speech was slurred, and he had to help her walk to the car. After taking her to her home, Nix asked Dickason to stay but he didn't feel comfortable based on how intoxicated she appeared. Id. at 1.

63. The Probable Cause Affidavit also describes video surveillance footage at Hankins' residence depicting how Nix had difficulty maintaining her balance and fell over. Id. at 1.

64. The Probable Cause Affidavit highlights that the SANE exam detected seminal fluid on Nix's vaginal swabs, external genitalia swabs, and on her panties, and that the DNA testing resulted in the following finding: "Timothy Hankins cannot be

excluded as a potential contributor of the haplotype information obtained." Id. at 2.

65. Lastly, the Probable Cause Affidavit notes that the blood and urine testing from the SANE exam showed that Nix's blood alcohol level was 0.18 at the time of the SANE exam, approximately 3 hours after her encounter with Hankins.

66. After submitting the Probable Cause Affidavit to the Payne County District Attorney's Office, Ehrenrich had no further involvement in the decision to file charges against Hankins. (Docket Nos. 76 ¶ 21; 77 ¶ 24).

67. On November 23, 2020, Payne County prosecutors presented the Probable Cause Affidavit to Tulsa County Judge David Guten, who reviewed the Probable Cause Affidavit and determined there was probable cause to arrest Hankins on charges of first-degree rape or in the alternative sexual battery. Prosecutors filed the original Information on November 23, 2020. Judge Guten signed the warrant for Hankins' arrest. (Docket Nos. 76 ¶ 22; 77 ¶ 25).

68. The case was filed as Case No. CF-2020-5224, State of Oklahoma v. Timothy Francis Hankins Jr ("Oklahoma v. Hankins"). (Docket No. 77 ¶ 26).

69. On April 27, 2021, Payne County prosecutors amended the charges to drop the sexual battery charge and added rape by instrumentation. (Docket Nos. 76 ¶ 23; 77 ¶ 27).

Civil No. 22-515 (SEH)                                                    24

70. On April 28, 2021 and May 19, 2021, Tulsa County District Court Judge Tonya Wilson conducted a preliminary hearing in the case Oklahoma v. Hankins, Case No. CF-2020-5224. At the preliminary hearing, numerous witnesses testified, and Hankins' attorney cross-examined witnesses and presented witnesses and evidence on Hankins' behalf. All the surveillance video of the interactions between Nix and Hankins were admitted into evidence and reviewed by Judge Wilson. (Docket Nos. 76 ¶ 24; 77 ¶ 28).

71. At the conclusion of the preliminary hearing and after reviewing all evidence presented, Judge Wilson found probable cause that Hankins had committed the crime of rape in the first degree as well as rape by instrumentation, and he was bound over for trial. Id.

72. On July 6, 2021, through his attorney, Hankins filed a Motion to Quash Evidence Adduced at Preliminary Hearing, seeking dismissal of the case. The State filed a response on August 2, 2021. Judge Clifford Smith heard arguments on the motion August 4, 2021 and ultimately overruled the same. (Docket Nos. 76 ¶ 25; 77 ¶ 29).

73. A jury trial in Oklahoma v. Hankins, Case No. CF-2020-5224, was held from April 26-29, 2022, before Tulsa County District Judge Clifford Smith. (Docket Nos. 76 ¶ 26; 77 ¶ 30).

74. At the close of the State's case, Hankins demurred to the evidence and moved for directed verdict. Judge Smith denied Hankins' motion, finding there was sufficient evidence to submit the case to the jury.

> In my research on the issue, I can't find a lot, but it comes down to incapacitated, and everything indicates that's ultimately a job for the finder of fact. So I'm going to overrule the demurrer. I'm going to withhold a ruling on Instrumentation until we get down to the point that I have to determine what to instruct the jury. But I'm overruling the demurrer at this time.

(Docket Nos. 76 ¶ 26; 77 ¶ 30; 76-10 at 297).

75. Hankins then presented evidence in his own defense, including his own testimony and two expert witnesses. At the close of his case, Hankins moved for a directed verdict on the primary and alternative charges. Based on Hankins' testimony that he had engaged in sexual intercourse with Nix, the alternative charge of Rape by Instrumentation was withdrawn. The motion for directed verdict was also denied by Judge Smith. (Docket No. 77 ¶ 31; 77-18 at 438-439).

76. Ultimately, the jury acquitted Hankins. (Docket Nos. 76 ¶ 26; 77 ¶ 31).

77. The Tulsa Police Department has promulgated Policies and Procedures, Rules and Regulations, Departmental Orders, and Operations Manuals to ensure the efficient and lawful administration of justice. In particular, TPD policies

provide instruction on Interviews and Interrogations, Arrest Warrants, Search Warrants, and Major Crime Scenes/Sexual Assaults. (Docket No. 77 ¶¶ 32-33).

78. Tulsa Police Rules and Regulations state that "[e]mployees shall not make a false report nor knowingly enter into any department record or report any inaccurate, false, or improper information." (Docket Nos. 77 ¶ 34; 77-20 at 30).

79. All Tulsa Police Department officers take an Oath of Office swearing to "defend, enforce, and obey the Constitution and laws of the United States, the State of Oklahoma, and the Charter and Ordinances of the City of Tulsa" and "protect the rights, lives, and property of all citizens." (Docket No. 77 ¶ 35).

80. It is the Tulsa Police Department Special Victims Unit's practice to "coordinate with the district attorney's office prior to submitting an affidavit so they can have an understanding of the case." Id. ¶ 36.

## IV.   APPLICABLE LAW

### A. 42 U.S.C. § 1983

Section 1983 of the Civil Rights Act provides that a person acting under color of state law who "subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42

Civil No. 22-515 (SEH)                                                    27

U.S.C. § 1983. In Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658 (1978), the Supreme Court determined that local governments and municipalities are "persons" under the Civil Rights Act and can therefore be subject to a Section 1983 claim as well.

Crucially, Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." Baker v. McCollan, 443 U.S. 137, 145 n. 3 (1979); see also Gonzaga Univ. v. Doe, 536 U.S. 273, 285 (2002) ("[S]ince § 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, i.e., rights independently 'secured by the Constitution and laws' of the United States"). "Section 1983 does not allow plaintiffs to create a federal case out of "every violation of state common law." Margheim v. Buljko, 855 F.3d 1077, 1084 (10th Cir. 2017) (quotations omitted). The first inquiry in any Section 1983 suit is therefore "whether the plaintiff has been deprived of a right 'secured by the Constitution and laws.'" Id. (quoting Baker, 443 U.S. at 140; 42 U.S.C. § 1983). Relevant to the case at bar, "[t]he Fourth Amendment provides one source of rights enforceable in a § 1983 action." Id.

Civil No. 22-515 (SEH)                                                      28

### B. Qualified Immunity

An "individual defendant named in a § 1983 action may raise a defense of qualified immunity, which shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." Est. of Booker v. Gomez, 745 F.3d 405, 411 (10th Cir. 2014) (quotations omitted) (cleaned up). Once a defendant asserts qualified immunity, "the plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." Cillo v. City of Greenwood Vill., 739 F.3d 451, 460 (10th Cir. 2013).

Notably, when a defendant moves for summary judgment based on qualified immunity, "courts must still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor." Gomez, 745 F.3d at 411. However, unlike most affirmative defenses, plaintiff bears "the ultimate burden of persuasion at trial to overcome qualified immunity by showing a violation of clearly established federal law." Id. Thus, at the summary judgment stage, courts "must grant qualified immunity unless the plaintiff can show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." Id.; see also Riggins v. Goodman, 572 F.3d

Civil No. 22-515 (SEH)                                                    29

1101, 1107 (10th Cir. 2009) ("[T]he Supreme Court has held that qualified immunity is proper when the record plainly demonstrates no constitutional right has been violated, or that the allegations do not offend clearly established.").

## C. Collateral Estoppel

The collateral estoppel doctrine, also known as issue preclusion, "is designed to prevent needless relitigation and bring about some finality to litigation" by barring "a party from relitigating an issue once it has suffered an adverse determination on the issue, even if the issue arises when the party is pursuing or defending against a different claim." Moss v. Kopp, 559 F.3d 1155, 1161 (10th Cir. 2009). Specifically, collateral estoppel will bar a claim if the four following elements are met:

> (1) the issue previously decided is identical with the one presented in the action in question, (2) the prior action has been finally adjudicated on the merits, (3) the party against whom the doctrine is invoked was a party or in privity with a party to the prior adjudication, and (4) the party against whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior action.

Id. (citing Frandsen v. Westinghouse Corp., 46 F.3d 975, 978 (10th Cir. 1995).

The rules of collateral estoppel are applicable to Section 1983 actions. See Allen v. McCurry, 449 U.S. 90, 105 (1980). Moreover, in Allen, the Supreme Court held that federal courts

"considering a section 1983 action must give preclusive effect to a state court judgment to the same extent a court in that state would." Hubbert v. City of Moore, Okl., 923 F.2d 769, 772 (10th Cir. 1991) (citing Allen, 449 U.S. at 96). "Because the preclusive effect of a prior state court judgment is defined by that state's law," the Court must evaluate Oklahoma law to determine whether the state court's finding of probable cause against Hankins collaterally estops the court from evaluating the existence of probable cause in the current federal proceeding. Id. at 772-773.

Under Oklahoma law, collateral estoppel "may only be invoked if the party against whom the earlier decision is interposed had a 'full and fair opportunity' to litigate the critical issue in the previous case" and has lost on that issue. Miller v. Miller, 956 P.2d 887, 897-898 (Okla. 1998). Accordingly, the defendant invoking collateral estoppel "must show that the issue sought to be precluded was actually litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior action." Id. 956 P.2d at 897; see also Fent v. Oklahoma Nat. Gas Co., a Div. of Oneok Inc., 898 P.2d 126, 133 (Okla. 1994).

### V.    DISCUSSION

### A. Collateral Estoppel is Inapplicable

Defendants argue that because probable cause was found to exist throughout the state criminal proceedings against Hankins,

collateral estoppel applies, and Plaintiff is precluded from relitigating the existence of probable cause. This would be fatal to Plaintiff's claims given that probable cause is a crucial element of both. If probable cause existed to arrest and prosecute Hankins, his claims for unlawful arrest and malicious prosecution fail and must be dismissed.

As discussed above, under Oklahoma law, a defendant invoking collateral estoppel as a defense "must show that the issue sought to be precluded was actually litigated and determined in the prior action between the parties or their privies, and that the determination was essential to the decision in the prior action." Miller, 956 P.2d at 897. In the case at bar, there is not exact identity between the parties in the state and federal proceedings and Defendants have not briefed the issue of privity. *See* Docket Nos. 76 and 77.

Pursuant to binding Tenth Circuit precedent, officers that are civilly sued in their individual capacity, and where their personal interests were not at stake in the criminal proceeding, are not considered in privity with the state of Oklahoma. *See* Kinslow v. Ratzlaff, 158 F.3d 1104, 1106 (10th Cir. 1998); McFarland v. Childers, 212 F.3d 1178, 1185 (10th Cir. 2000). Accordingly, collateral estoppel does not apply to Plaintiff's claims against Ehrenrich.

Civil No. 22-515 (SEH)                                                    32

The record reflects that although the investigation began in Tulsa, the Tulsa County District Attorney's office recused itself from any involvement in the investigation and the matter was referred to the Payne County District Attorney's Office. (Fact ¶ 40). In light of this fact and the fact that the parties did not brief the matter, the Court is not in a position to find whether the City of Tulsa is in privity with the State of Oklahoma. *See* Kinslow, 158 F.3d at 1106, n.2 (quoting Hildebrand v. Gray, 866 P.2d 447, 450 (OK CIV APP 1993)) (noting that privity requires that the party have "the same interest, character, or capacity as the party against whom the prior judgment was rendered.").

## B. Ehrenrich is Entitled to Qualified Immunity as to Plaintiff's Unlawful Arrest Claim because Probable Cause Existed for Hankins' Arrest

Plaintiff claims he was wrongfully and unreasonably arrested in violation of the Fourth Amendment. The Fourth Amendment protects individuals against unreasonable seizures, including arrests, in the absence of probable cause. *See* U.S. Const. amend. IV. "Probable cause exists where the facts and circumstances known to the officer at the time of arrest, and of which the officer had reasonably trustworthy information, were sufficient to warrant a prudent person in believing defendant had committed or was committing a criminal offense." United States v. Rodriguez, 739 F.3d 481, 485 n.2 (10th Cir. 2013) (citing Beck v. Ohio, 379 U.S. 89, 91 (1964)).

Civil No. 22-515 (SEH)                                                      33

Whether probable cause existed "does not require proof beyond reasonable doubt" nor that "the suspect's guilt...be 'more likely true than false.'" Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011) (quoting Texas v. Brown, 460 U.S. 730, 742 (1983)). "Instead, the relevant question is whether a substantial probability existed that the suspect committed the crime, requiring something more than a bare suspicion." Id. (internal quotations and citations omitted).

Under the qualified immunity doctrine, "law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." Hunter v. Bryant, 502 U.S. 224, 227 (1991) (quotations omitted); see also Anderson v. Creighton, 483 U.S. 635, 641 (1987) ("We have recognized that it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable."); Stonecipher v. Valles, 759 F.3d 1134, 1141 (10th Cir. 2014) (internal quotations omitted) ("In the context of a qualified immunity defense on an unlawful search or arrest claim, we ascertain whether a defendant violated clearly established law by asking whether there was 'arguable probable cause' for the challenged conduct. Arguable probable cause is another way of saying that the officers' conclusions rest

on an objectively reasonable, even if mistaken, belief that probable cause exists.").

The fact that a neutral judge issued an arrest warrant "is the clearest indication that the officers acted in an objectively reasonable manner, or in objective good faith. Nonetheless, that fact does not end the inquiry into objective reasonableness." Messerschmidt v. Millender, 565 U.S. 535, 547 (2012) (internal quotations omitted). Qualified immunity cannot be granted (1) "where the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable" Id. (quotations omitted). "Nor will a warrant protect officers who misrepresent or omit material facts to the magistrate judge." Stonecipher, 759 F.3d at 1142. Plaintiff bears the burden of making "a substantial showing of deliberate falsehood or reckless disregard for truth" by the officer seeking the warrant." Id. (internal quotation omitted).

In the present case, Plaintiff contends that Ehrenrich both included falsified inculpatory facts and knowingly or recklessly omitted numerous facts. (Docket No. 92 at 28). The Tenth Circuit has explained that:

> Where false statements have been included in an arrest warrant affidavit, the existence of probable cause is determined by setting aside the false information and reviewing the remaining contents of the affidavit. In a case involving information omitted from an affidavit, the existence of probable cause is

> determined by examining the affidavit as if the omitted information had been included and inquiring if the affidavit would still have given rise to probable cause for the warrant.

Wolford v. Lasater, 78 F.3d 484, 489 (10th Cir. 1996) (internal quotations and citations omitted).

But first, the Court "begin[s] with what *was* included in the affidavit and *isn't* challenged." Kerns, 663 F.3d at 1188 (emphasis in original). Per the unchallenged portions of the Probable Cause Affidavit, Nix met with Hankins at Oren's, drank alcohol with him at the bar, and her memory went from "so clear to not so clear." (Fact ¶ 61). Video surveillance footage from Hankins' residence shows them entering the residence and being on the patio; Nix then has difficulty maintaining balance and falls into the bushes before Nix and Hankins subsequently leave the residence. (Fact ¶ 63). Nix subsequently arrived at Doc's, where she was observed by Snow to be acting disoriented and very intoxicated. (Fact ¶ 62). The SANE exam detected seminal fluid on Nix's vaginal swabs and external genitalia. (Fact ¶ 64). The DNA testing resulted in Hankins not being excluded as a potential contributor. Id. Nix's blood alcohol was 0.18 at the time of the SANE exam. (Fact ¶ 65).

Taken together, the Court finds that these facts are sufficient to establish probable cause that Hankins committed Rape in first degree under Oklahoma law, which can include "[r]ape accomplished where the victim is at the time unconscious of the

nature of the act and this fact is known to the accused[.]" Okla. Stat. Ann. tit. 21, § 1114(2) and (4); *See* Stonecipher, 759 F.3d at 1141 (quotations omitted) ("Probable cause is not a precise quantum of evidence—it does not, for example, 'require the suspect's guilt to be 'more likely true than false.' Instead, the relevant question is whether a 'substantial probability' existed that the suspect committed the crime, requiring something 'more than a bare suspicion.'").

Plaintiff takes issue with the Probable Cause Affidavit stating that Nix "blacked out" after drinking with Hankins and that her next clear memory was standing in Doc's. (Docket No. 92 at 28). He argues that this constitutes a falsified inculpatory fact because when drafting the Affidavit, Ehrenrich knew that Nix remembered several events between drinking with Hankins and being at Doc's. Id. Having evaluated the record, the Court finds that this statement is not a false characterization that needs to be stricken. During Ehrenrich's interview of Nix, she stated that after walking out of Oren's with Hankins, she only remembered bits and pieces: such as being in a dark house, falling and not being able to hold up her body, and then being at Doc's. (Fact ¶ 43). Recently, the Tenth Circuit reiterated its position that generally, a "victim's own statement to police may independently establish probable cause absent some reason to think the statement not trustworthy, particularly when law enforcement officers

directly interview the victim." <u>Crothers v. Carr</u>, No. 23-8014, 2025 WL 1122681, at *6 (10th Cir. Apr. 16, 2025) (internal quotation omitted). Although the Probable Cause Affidavit naturally does not reflect the totality of Nix's statements, it is a faithful representation of Nix's description of the events, which has consistently been that she only remembered portions of the evening after leaving the bar with Hankins. *See* Fact ¶ 34 (the Sexual Assault Information Form reflects that Nix stated that "everything goes black for a while" after having drinks with Hankins); Fact ¶ 38 (the Tulsa Police Department Incident Report reflects that Nix described that she blacked out and only remembers pieces of the evening).

Plaintiff further argues that Ehrenrich omitted a wide range of "exculpatory facts" in the probable cause affidavit. The twenty-one omissions identified by Plaintiff consist of his appreciation of the events (*e.g.*, that he and Nix were acting in a friendly matter after the alleged rape), largely irrelevant details (such as Nix not explicitly using the word rape when evaluated by the SANE nurse), and importantly, a fact simply not supported by the record. The most crucial of these omissions is Plaintiff's contention that the DNA analysis showed seminal fluid from two males, neither of whom is Hankins, detected on the chest and neck swabs taken from Ms. Nix's body. This is not supported by the Criminalistics Examination Report. (Fact ¶ 47). The Criminalistics

Examination Report states that the tests of the chest and neck swabs revealed a DNA mixture of at least three individuals, that Nix cannot be excluded as a potential contributor and that Hankins is excluded as a potential contributor. Id. Furthermore, the sperm fraction recovered from the chest/neck swabs contained "very limited genetic information" and "is not suitable for interpretation and no conclusions can be made." Id. At the Jury Trial, Ms. Samantha Campenni-Hunt, the criminalist that prepared the toxicology report, explained that a person can collect DNA from someone else on their exposed neck or chest by skin-to-skin contact such as a hug, but that she cannot confirm how DNA got on Nix for sure. (Docket No. 76-10 at 317-318). None of this indicates that the chest and neck swabs revealed the conclusive presence of seminal fluid from two males.

The remaining omissions can largely be grouped together in nine (9) categories. The Court addresses each below. First, Plaintiff maintains that Nix did not tell the SANE Nurse or any investigator that she was raped or was unconscious during her contact with Hankins, but rather she remembered having sex with him. Plaintiff also notes that during the SANE test, Nix denied pain or notable injuries, and the SANE nurse did not observe any injuries. However, the Court finds that Nix's failure to explicitly state that she was raped during her SANE exam, and her choice in turn to use other language, is not exculpatory, especially when

coupled with Nix's contention that she had gaps in her memory. Furthermore, during her interview with Ehrenrich, Nix stated that she remembered Hankins trying to have sex but did not remember having sex. (Fact ¶ 43). Likewise, the absence of visible injuries is not dispositive.

Second, Plaintiff notes that video footage from inside Oren's and from Hankins' patio shows Nix initiating physical contact with Hankins, including rubbing his thighs, holding his hand, wrapping her arms around his neck, and throwing her legs around his waist. He further asserts that three to six minutes of contact between Hankins and Nix on the patio were not recorded by the surveillance camera. Even if included in the Affidavit, these facts are not exculpatory and do not negate the possibility of subsequent misconduct, as they are not indicative of consent or consciousness at the time of intercourse. Moreover, the Court notes that this video footage also shows Nix struggling to maintain balance and falling. (Fact ¶ 15).

Third, Plaintiff contends that when he took Nix home to look for her keys, she was conscious, and they were communicating on friendly terms. However, this amounts to Plaintiff's characterization and the degree of Nix's consciousness cannot be fully devised from the video footage at Nix's residence.

Fourth, Plaintiff argues that Nix's allegation that she only had "one or two" drinks on September 5th was a lie. The Probable

Cause Affidavit does not specify the number of drinks consumed but it highlights that her blood alcohol level was .18, well over the legal limit. *See e.g.,* United States v. Kirby, 161 F.4th 1208, 1211 (10th Cir. 2025) (noting that 0.08 percent is the legal limit under Oklahoma law). The number of drinks Nix remembered having is ultimately irrelevant to how intoxicated or conscious Nix actually became and how Hankins perceived her to be. Thus, this fact would not negate the existence of probable cause.

Fifth, Plaintiff takes issue with the fact that the Probable Cause Affidavit does not explicitly state that the toxicology results showed that there were no drugs in Nix's system on the morning of September 6, aside from her prescription amphetamine, and that no commonly used date rape drugs were recovered at Hankins' residence. Given that the Affidavit mentions the toxicology report regarding alcohol but is silent as to drugs, the Court finds that it could be inferred that no drugs were found in Nix's blood or urine. Even if explicitly added to the Probable Cause Affidavit, these facts do not negate the existence of Probable Cause. As noted in Ehrenrich's deposition testimony, not all drugs that can be used to overpower a victim and hinder their recollection are tested for in toxicology examinations. (Fact ¶ 52).

Sixth, Plaintiff claims that Ehrenrich manipulated the investigation by telling Dickason that Ms. Nix had been drugged

Civil No. 22-515 (SEH)                                                          41

and raped prior to interviewing him, altering his perspective. (Docket Nos. 92 at 29 and 92-3 ¶ 23). To support this claim, Plaintiff provided a signed declaration by Dickason. Defendant argues that the declaration was signed under duress to avoid a video deposition. (Docket Nos. 102 at 6 and 102-3). Even if this were added to the Probable Cause Affidavit, or if Dickason's observations were stricken in their entirety, the Affidavit would still have Nix's version of events, Snow's statement that Nix appeared disoriented and intoxicated when she arrived at Doc's, and reference to the video footage at Hankins' residence showing Nix having difficulty maintaining balance and falling over. (Facts ¶¶ 61-63). Accordingly, this fact does not negate probable cause. Moreover, Plaintiff does not provide any case law to establish that Ehrenrich could not inform Dickason of the underlying alleged crime being investigated prior to interviewing him.

Seventh, Plaintiff argues Ehrenrich should have disclosed that he had a pre-existing professional relationship with Nix and communicated in over 70 text messages and phone calls with Nix between September 6-9, 2020. Plaintiff has similarly failed to establish that these communications amount to wrongdoing. The Court finds that this omission is largely irrelevant to the facts of the case and thus, even if included in the Probable Cause Affidavit, would not negate a finding of probable cause.

Eighth, Plaintiff asserts that Nix remembered numerous details of the events before, during, and after her encounter with Hankins, including having sex. The Court finds that even if a more detailed summary of the events, such as those provided by Nix during her interview with Ehrenreich, were included, the Affidavit would still give rise to probable cause. The Probable Cause Affidavit constitutes a succinct summary of Nix's version of the events, as told to Ehrenrich and is consistent with what she told both Dollins (the SANE nurse) and Officer Talley. (Facts ¶ 30-31; 35; 43).

Lastly, Plaintiff contends that Nix was in the midst of an emotional meltdown over the abrupt and dramatic end of an inappropriate relationship with her married supervisor. The Court finds that this is wholly irrelevant to a finding of probable cause. "Probable cause is based on the totality of the circumstances, and requires reasonably trustworthy information that would lead a reasonable officer to believe that the person about to be arrested has committed or is about to commit a crime." Cortez v. McCauley, 478 F.3d 1108, 1116 (10th Cir. 2007). Having evaluated the totality of the record and the Probable Cause Affidavit vis-à-vis Hankins' arguments, the Court concludes that Ehrenrich's finding that probable cause existed was objectively reasonable. *See* Hunter v. Bryant, 502 U.S. 224, 227 (1991); Stonecipher, 759 F.3d at 1141. Having reviewed Ehrenrich's

interview of Nix, the Court finds that this on its own would be sufficient to establish probable cause in this case. *See* Crothers, No. 23-8014, 2025 WL 1122681, at \*6. Moreover, none of Plaintiff's arguments outlined above amount to "obvious reasons to doubt the veracity" of Nix's allegations. Stonecipher, 759 F.3d at 1142. Ultimately, Plaintiff failed to meet his burden of making "a substantial showing of deliberate falsehood or reckless disregard for truth" by Ehrenrich. Id. Because probable cause existed, Defendant Ehrenrich is entitled to qualified immunity with regard to Plaintiff's unlawful arrest claim. Plaintiff's unlawful arrest claim against Ehrenrich is **DISMISSED**.

### C. Ehrenrich has Qualified Immunity as to Plaintiff's Malicious Prosecution Claim because Probable Cause Existed for Hankins' Arrest and Prosecution

To establish a malicious prosecution claim pursuant to Section 1983, Plaintiff must show: "(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the arrest, confinement, or prosecution; (4) the defendant acted maliciously; and (5) the plaintiff sustained damages." Shrum v. Cooke, 60 F.4th 1304, 1310 (10th Cir. 2023) (citation omitted). Once an individual defendant asserts qualified immunity, the plaintiff must meet their burden of showing all five elements of malicious prosecution to establish a Fourth Amendment violation. *See* Margheim, 855 F.3d at 1087.

Civil No. 22-515 (SEH)                                              44

As discussed above at length, Plaintiff cannot establish the element that "no probable cause supported the arrest." Because Hankins cannot meet this essential factor of his malicious prosecution claim, the Court need not address the rest. Ehrenrich is thus similarly entitled to qualified immunity as to Plaintiff's malicious prosecution claim. Plaintiff's malicious prosecution claim against Ehrenrich is **DISMISSED**.

**D. Plaintiff Cannot Establish Section 1983 Liability Against the Municipality because Probable Cause Existed**

To succeed in a Section 1983 claim against a municipality, "a plaintiff must show two elements: '(1) a municipal employee committed a constitutional violation, and (2) a municipal policy or custom was the moving force behind the constitutional deprivation.'" Campbell v. City of Spencer, 777 F.3d 1073, 1077 (10th Cir. 2014) (quoting Cordova v. Aragon, 569 F.3d 1183, 1193 (10th Cir. 2009)). Although "qualified immunity is not available as a defense to municipal liability[,]" Pyle v. Woods, 874 F.3d 1257, 1264 (10th Cir. 2017), the Court's previous determination regarding the existence of probable cause precludes municipal liability in this case.

Plaintiff's Fourth Amendment claims are both based on his allegation that there was no probable cause for his arrest and prosecution. However, as discussed at length above, the Court explicitly holds that probable cause existed. Therefore, Ehrenrich

Civil No. 22-515 (SEH)                                           45

did not commit a constitutional violation. "A municipality may not be held liable where there was no underlying constitutional violation by any of its officers." Hinton v. City of Elwood, Kan., 997 F.2d 774, 782 (10th Cir. 1993) (citing City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986)); *see also* Myers v. Oklahoma Cnty. Bd. of Cnty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998). For this reason, Plaintiff's claims against the City of Tulsa are **DISMISSED.**

## VI.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** Defendant Darin Ehrenrich's *Motion for Summary Judgment* at Docket No. 76 and Defendant City of Tulsa's *Motion for Summary Judgment* at Docket No. 77. Judgment **DISMISSING** this action **WITH PREJUDICE** shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 1st day of May 2026.

S/ RAÚL M. ARIAS-MARXUACH
United States District Judge